**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a1121n.06

**10-1539**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Oct 31, 2012*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| PATRICK JAMES McLEMORE, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| THOMAS K. BELL, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |

Before: DAUGHTREY and ROGERS, Circuit Judges; ZOUHARY, District Judge.[*]

MARTHA CRAIG DAUGHTREY, Circuit Judge. Petitioner Patrick McLemore, a Michigan state prisoner, appeals the district court's judgment denying him habeas relief from the effective life sentence he is currently serving following his convictions for first-degree felony-murder and carjacking. Before this court, McLemore alleges: (1) that the Michigan state trial court committed constitutional error in instructing the jury on the concept of aiding and abetting felony-murder and on the need for unanimity in its verdict; (2) that the prosecutor's misconduct deprived him of due process of law; (3) that the trial court denied him the opportunity to mount an effective defense by excluding witness testimony; (4) that his trial counsel provided constitutionally ineffective legal assistance;

---

[*]The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

and (5) that his appellate counsel also failed to provide adequate representation. For the reasons set out below, we disagree and affirm the judgment of the district court.

## *FACTUAL AND PROCEDURAL BACKGROUND*

Many of the facts underlying the petitioner's prosecution are not in serious dispute. McLemore himself concedes that sometime during the late-night or early-morning hours of June 14-16, 1999, he, then 16 years old, and his 19-year-old friend, Nathan Reid, found a wrench in the yard behind Reid's former residence. As the two continued walking through the neighborhood, they approached the residence of Oscar Manning and broke into the house through an unlocked garage door. McLemore was acquainted with Manning because he had mowed Manning's lawn on a number of occasions.

The petitioner also admits that by the time he and Reid left Manning's property, Manning had been bludgeoned to death in his bedroom while he and Reid took off with a video cassette recorder, a ring, and one of Manning's cars. Exactly how the brutal murder occurred is subject to differing accounts. In his own trial testimony, McLemore claimed that Reid first entered Manning's home alone, despite McLemore's pleas that he not do so. According to McLemore, he decided to stay in the garage rather than risk being seen by a man he knew, but he eventually entered the house, where he saw Manning lying motionless in his blood-splattered bedroom. He then claimed to have stood horrified in the room as Reid rifled through dresser drawers in search of valuables. Rather than continue

to remain in the room, McLemore said, he ran out of the house and began fleeing the scene until Reid, driving an automobile stolen from Manning's garage, caught up with him.

The petitioner offered additional testimony that in the hours and days following the murder, he, Reid, and various other friends stole cases of liquor, patronized a prostitute, and eventually hid the stolen vehicle in a wooded area near Reid's residence. McLemore also spoke with some of his friends about the murder, but denied telling those friends that he had actually struck the victim. In fact, at trial, the petitioner went so far as to admit that he entered Manning's home with the intent to steal but insisted that he was not aware of, or involved in, plans to injure or murder anyone. The defense also emphasized the fact that, although one of McLemore's shoes was stained with blood matching the victim's, other physical evidence pointed to Reid as the mastermind of the criminal spree. Indeed, the stolen car was found only yards from Reid's home, and Manning's car keys, ring, and VCR were all found in Reid's possession, in his home, or in a vehicle owned by his mother.

Neither the prosecution nor the defense called Reid as a witness to establish the petitioner's complicity or lack of complicity in the slaying of Oscar Manning, despite the fact that Reid had already pleaded no-contest to second-degree murder, armed robbery, carjacking, and first-degree home invasion in connection with Manning's death. Instead, to hold the petitioner accountable for the crimes, the prosecution introduced not only physical evidence, such as McLemore's blood-splattered shoes, but also the testimony of the friends to whom he had spoken after the criminal escapade. For example, Phillip

Donnelly testified that he spoke with McLemore shortly after Manning's death, recalling that:

> [McLemore] started crying a little bit and he – he said that he was – he was gonna go to hell for the rest of his life and that God will never forgive him for what he did. I asked him what he did, he said that the man, the old man in the yellow house, I murdered him. . . . He told me he – it's like I didn't – I – I didn't know what I was doing.
>
> * * * * *
>
> He told me that he was just going over there to get something out of the house because he didn't think that the old man was there, and the incident happened and – he told me that he hit the guy with a wrench and then dropped the TV on him.
>
> * * * * *
>
> [H]e told me that he struck him repeatedly because he – he was still standing there and I – I guess he wasn't – he just wouldn't fall down, so he hit him more than once.
>
> * * * * *
>
> [H]e said that Oscar, that he had grabbed him, that Oscar had grabbed him, and that he – that he was just trying to get away fromhim.
>
> * * * * *
>
> He said that he had blood on his upper body and he tried – he tried to wash it off but it wouldn't all come off.

Following trial, the jury acquitted McLemore of premeditated murder but found him guilty of felony-murder, armed robbery, carjacking, and first-degree home invasion. However, the state trial judge vacated the convictions for armed robbery and home invasion on double jeopardy grounds and sentenced McLemore to concurrent sentences of life in prison for felony-murder and 225-600 months for carjacking.

After the Michigan Court of Appeals affirmed his convictions and the Michigan Supreme Court denied leave to appeal, the petitioner filed a motion for relief from judgment pursuant to Michigan Court Rule 6.502, raising issues not presented on direct appeal. The trial court denied that motion, and the state appellate courts again denied leave to appeal. Having unsuccessfully navigated his way through state-court review, McLemore then filed this petition for a writ of habeas corpus in district court, alleging six violations of the federal constitution. The state responded by contending that three of those claims were procedurally defaulted and the remaining claims did not merit relief.

The matter was referred to a magistrate judge who recommended denial of the petition under 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."), after determining that McLemore's claims lacked merit. The district judge adopted the report and recommendation and also concurred in the suggestion that a certificate of appealability issue on only three of the issues identified by McLemore. We later expanded that certificate to include two additional issues, and the petitioner now pursues all five of those claims on appeal.

**DISCUSSION**

Because McLemore filed his habeas petition well after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L.No. 104-132, 110 Stat. 1214 (1996), the provisions of that Act govern the resolution of this dispute. *See*

*Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Greer v. Mitchell*, 264 F.3d 663, 671 (6th Cir. 2001). Thus, we may not grant the writ unless the state-court adjudication on the merits either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

As explained by the United States Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

In deciding whether a state-court ruling involved an "unreasonable application" of federal law, a habeas court does not focus merely upon whether the state-court decision was erroneous or incorrect; rather, a federal court may issue a writ of habeas corpus only if the state court's application of clearly-established federal law was objectively unreasonable.

*Id*. at 409-11. Furthermore, "[t]his court reviews a district court's legal conclusions in a habeas proceeding de novo and its factual findings for clear error." *Greer*, 264 F.3d at 671 (citing *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999)).

## 1. Inadequate Jury Instructions

McLemore first asserts that the trial court's jury instructions on aiding and abetting and on the necessity of a unanimous verdict were so inadequate and ambiguous as to deprive him of due process. As the petitioner recognizes, a habeas challenge to a jury instruction requires more than showing that the particular instruction is erroneous. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). In fact, he must establish that the jury charge, considered in the context of the instructions as a whole, "so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). This he cannot do.

McLemore's trial counsel failed to offer a contemporaneous objection to either of the jury instructions that the petitioner now challenges. Furthermore, the petitioner also failed to raise an issue regarding the propriety of the instruction on aiding and abetting on direct appeal. Consequently, the State of Michigan, through Warden Thomas Bell, now asserts that these jury-instruction issues have been procedurally defaulted and need not be addressed by this court.

As we noted in a recent *en banc* decision, a claim by a habeas petitioner is defaulted if:

> (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default.

*Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (quoting *Tolliver v. Sheets*, 594 F.3d 900, 928 n.11 (6th Cir. 2010) (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986))). "The 'cause' standard in procedural-default cases requires the petitioner to show that 'some objective factor external to the defense impeded counsel's efforts' to raise a claim in the state courts. *McCleskey v. Zant*, 499 U.S. 467, 493 . . . (1991)." *Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012), *petition for cert. filed* (U.S. Jul. 10, 2012) (No. 12-5231).

The petitioner argues in this case that the ineffective assistance of his trial counsel was the cause for his failure to object to the challenged jury instructions. Such ineffective assistance of counsel may indeed serve as "cause" sufficient to excuse noncompliance with a state procedural rule. *See, e.g.*, *McCleskey*, 499 U.S. at 493-94. However, when, as here, counsel on direct appeal also failed to allege the ineffective assistance of trial counsel, "a procedurally defaulted ineffective-assistance-of-counsel claim can serve as cause to excuse the procedural default of another habeas claim only if the habeas

petitioner can satisfy the 'cause and prejudice' standard with respect to the ineffective-assistance claim itself." *Edwards v. Carpenter*, 529 U.S. 446, 450-51 (2000).

McLemore attempts to do so in this habeas action by alleging not only the ineffective assistance of trial counsel, but also the ineffective assistance of *appellate* counsel, who failed to raise the challenge to the representation offered by the petitioner's attorney at trial. For such a challenge to succeed, the record must establish "(1) that counsel's performance was objectively deficient; and (2) prejudice, which means that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Haliym v. Mitchell*, 492 F.3d 680, 694 (6th Cir. 2007) (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984)).

The situation before us highlights the analytical morass in which procedural-default rules ensnare us when attempting to resolve federal constitutional claims. Paradoxically, in order to determine whether procedural rules prevent us from examining the merits of the petitioner's substantive claims, we must first examine the merits of those underlying substantive claims. This is so because it is only by determining whether the substantive claims have merit that we can evaluate whether the petitioner actually suffered the prejudice necessary to establish his ineffective-assistance-of-counsel "cause" to excuse any procedural default resulting from the application of state procedural rules. Thus, because we must reach the underlying merits of the petitioner's claims in order to dispose of the ineffective-assistance-of-counsel claims, we need not decide whether the petitioner's

substantive claims have been procedurally defaulted. *See Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008). An analysis of the merits of the petitioner's substantive claims "present[s] a more straightforward ground for decision, prompting us to consider [these] issue[s] at the outset." *Arias v. Hudson*, 589 F.3d 315, 316 (6th Cir. 2009) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (allowing courts to reject habeas claims on the merits and skip procedural-default issues)).

## a. Jury Instruction on Aiding and Abetting

At the conclusion of the testimony in the petitioner's trial, the judge instructed the jury on what they, as finders of fact, should consider in determining whether to find McLemore guilty as a principal offender. In addition, the court offered the following instructions on aiding and abetting the charged crimes:

> All right, members of the jury, in the state of Michigan we have a statute that provides that all person[s] who aid, abet or assist others in the commission of felony crimes are equally guilty.
>
> In this case the defendant may be considered guilty as directly committing these offense[s] as charged or by intentionally assisting someone else in committing them. Anyone who intentionally assists someone else in committing a crime is as guilty as the person who directly commits the crime and can be convicted of the crime as an aider and abetter. To prove the charge under this theory the prosecutor must prove each of the following elements beyond a reasonable doubt.
>
> First, that the alleged crime or crimes were actually committed either by the defendant or someone else. It does not matter whether anyone else has been convicted of the crimes.
>
> Second, that before or during the crime or crimes the defendant did something to assist in the commission of the crimes.

Third, the defendant must have intended the commission of the crime alleged or must have known the other person intended its commission at the time he gave the assistance. In determining whether the defendant intended to help someone else commit the charge offenses, members of the jury, of either Murder, Robbery, Carjacking or Home Invasion, you may consider whether those offenses were fairly within the common unlawful activity of those defendants at that time on that night or early morning, that is, whether the defendant might have expected the charged offense to happen as part of that activity. There can be no criminal liability for any crime not fairly within the common unlawful activity. It is not sufficient for the prosecutor just to prove the defendant intended to help another in the common unlawful activity[;] it is necessary the prosecutor – for the prosecutor to prove beyond a reasonable doubt that the defendant intended to help someone else commit the charged crimes. It does not matter, members of the jury, however, how much help, advice or encouragement the defendant gave the other person[;] however, you must decide whether the defendant intended to help the other person commit the crime and whether his help, advice or encouragement actually did help, advise or encouraged the commission of those crimes as I have previously described them for you.

And further, members of the jury, even if the defendant knew the alleged crime or crimes were planned or were being committed, the mere fact he was present when they were committed is not enough to prove that he assisted the other person in committing them.

Although he offered no objection at trial, McLemore now insists that this instruction was flawed and deprived him of due process. Specifically, he argues that, hearing and heeding those instructions, "[a] reasonable juror could easily find that because McLemore admitted to aiding and abetting *some* of the charged crimes[,] that he was by admission guilty of aiding and abetting a felony murder solely on the basis of that admission."

Were we to consider only the jury instructions offered to explain the concept of aiding and abetting, it is possible that we might agree with the petitioner that a juror could misconstrue the findings that must be made to support a guilty verdict on felony-murder.

As stated earlier, however, "[j]ury instructions are reviewed as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury." *United States v. Poulsen*, 655 F.3d 492, 501 (6th Cir. 2011), *cert. denied*, 132 S.Ct.1772 (2012) (citation omitted). In addition to the quoted instructions regarding aiding and abetting "Murder, Robbery, Carjacking or Home Invasion," the trial judge offered instructions regarding the offense of felony-murder. In those instructions, the judge explained that a guilty verdict on the felony-murder charge required the jurors to conclude, as one element of the offense, that McLemore "[e]ither . . . intended to kill, or he intended to do great bodily harm to Oscar Manning, or he knowingly created a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of his actions."

Thus, even if the jurors applied the aiding-and-abetting instruction to the felony-murder charge, rather than only to the charges of the predicate offenses of robbery, carjacking, or home invasion, an earlier portion of the instructions still required the jurors to conclude that McLemore possessed the requisite intent explained in the felony-murder instructions. Therefore, contrary to McLemore's contention, viewing the jury charge as a whole and presuming that the jurors followed the instructions given to them, *see, e.g.*, *United States v. Harvey*, 653 F.3d 388, 396 (6th Cir. 2011) ("[j]urors are presumed to follow instructions"), we conclude that the jury could not have convicted the petitioner of felony-murder solely on the basis that he aided and abetted Nathan Reid in the commission of a predicate offense.

### b. Jury Instruction on the Necessity of a Unanimous Verdict

Also included in the jury instructions given at the petitioner's trial was the following directive:

> A verdict in a criminal case must be unanimous[;] to be unanimous each of you must agree upon which type or types of First Degree Murder have been proved. If you return a verdict of guilty of First Degree Murder your unanimous verdict must specify whether all of you have found the defendant guilty of Premeditated First Degree Murder or Felony Murder or both, and that will be set forth on the verdict form for your use in the jury room.

McLemore contends that the required unanimity was not achieved by the jury verdict because the jury did not indicate which of the possible predicate offenses it was considering to elevate the second-degree murder to first-degree felony-murder. However, the jury unanimously found the petitioner guilty of *each* of the charged predicate offenses for felony-murder – robbery, larceny, and breaking and entering (home invasion). There is, therefore, no dispute that the required unanimity was achieved and that McLemore suffered no prejudice from a defect in the jury instructions.

### 2. Prosecutorial Misconduct

McLemore next submits that two purportedly improper comments by the prosecutor infected his trial and deprived him of due process. Again, as with the allegations of error regarding the jury instructions, the petitioner failed to object to the challenged statements

at the time they were made. In response to the state's argument that these claims of prosecutorial misconduct have thus been procedurally defaulted, McLemore again relies on the ineffective assistance of his trial and appellate counsel as "cause" that excuses his failure to comply with established Michigan procedural requirements. And, again, because analysis of the ineffective-assistance-of-counsel claims would require us to examine the merits of the petitioner's allegations in order to determine whether he suffered prejudice, we opt to examine these issues on the merits.

### a. Comment Regarding Liability for Aiding and Abetting

In a corollary to his argument concerning the alleged ambiguity of the trial court's jury instructions on aiding and abetting, McLemore insists that during closing argument, the prosecutor made misleading statements that "effectively told the jury that if Reid killed the victim, McLemore was still guilty because he admitted to entering the home to commit a felony crime as an aider and abettor." Specifically, the petitioner points to the following section of the prosecutor's closing argument:

> If you remember the testimony, if you remember the physical evidence, the circumstantial evidence, it all points to one thing. He went in there and he beat Mr. Manning to death whether alone or with his running buddy it doesn't make a difference. The Judge is going to tell you that under the aiding and abetting law in Michigan, that even if you help somebody commit a crime, and that's assuming you believe him, I have spent a great deal of time explaining to you why you shouldn't believe him, but even if you believe every word he said, he is still is [sic] guilty because he is assisting somebody else commit this terrible crimes [sic], and the law says it doesn't matter how much help, it doesn't matter that you even assisted just a little bit, if you

helped someone commit a crime you're just as guilty, and that is if you believe everything he told you.

When reviewing an allegation of prosecutorial misconduct in a habeas case, "the relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the conviction a denial of due process." *Lundgren v. Mitchell*, 440 F.3d 754, 778 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation and internal quotation marks omitted). "In order to satisfy the standard for prosecutorial misconduct, the conduct must be both improper and flagrant." *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006) (citation omitted). Thus, if, and only if, the prosecutor's actions or comments are deemed improper, a reviewing court then considers four factors to determine whether the improper conduct was also flagrant: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the [petitioner]." *Id.* (citation omitted).

Viewed in isolation, there is nothing particularly improper or troubling about the prosecutor's argument concerning the applicable law on aiding and abetting. Nevertheless, McLemore contends that a broader view of the situation evidences the prosecutor's intent to "outwit and entrap" the petitioner by enticing him to admit entering Manning's home with an intent to steal and then piggybacking that admission on top of Reid's guilty plea to aiding and abetting Manning's murder. As discussed previously,

however, the jury instructions were sufficient to ensure that the jurors did not convict McLemore simply on the grounds that he aided and abetted the commission of a predicate offense to the crime of felony-murder. Instead, the court clearly charged the jury that, before finding the petitioner guilty of felony-murder, the jurors must unanimously agree that McLemore possessed the requisite intent to kill, to do great bodily harm, or to knowingly create "a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of his actions." Thus, the prosecutor's argument in no way lessened the requisite burden of proof that the law placed upon the state.

McLemore also makes much of the fact that the prosecutor secured Reid's guilty plea to aiding and abetting second-degree murder shortly before the start of his trial. According to the petitioner, such flip-flopping of theories as to which of the two defendants actually killed Manning was a violation of his constitutional right to a fair trial as guaranteed by the Fifth, Sixth, and Fourteenth Amendments. That argument fails, however, for two reasons.

First, the prosecution's main theory throughout McLemore's trial was that he was the actual murderer of the victim, not that he merely aided and abetted the crime. The aiding-and-abetting argument advanced during closing statements was, therefore, merely an alternative theory of guilt that the jury could accept if it believed McLemore's testimony and not the state. Second, as in the case of *Bradshaw v. Stumpf*, 545 U.S. 175 (2005), even if the prosecution had advanced only an aiding-and-abetting theory, the fact that the

state crime of aiding and abetting treats the principal and the aider and abettor equally insulates the petitioner's conviction from constitutional infirmity.

The first identified statement by the prosecutor during closing argument was not improper and, therefore, we need not engage in further analysis to determine whether the statement was also flagrant.

## b. Shifting of the Burden of Proof

Prior to the start of the petitioner's trial, the state court granted a defense motion to suppress a statement that McLemore had given to the police after his arrest. Nevertheless, during the trial, the prosecutor, while examining Detective Brian Moffit, engaged in the following exchange:

Q. Okay. Did you at some point in time come to interview some other witnesses?

A. Yes.

Q. And who all did you interview in regards to this particular investigation?

A. Can I refer to my notes, there are quite a few?

Q. Sure, if you will.

A. I interviewed, took part in the interview with both defendants on the day of their arrest.

According to the petitioner, the prosecutor's elicitation of the fact that McLemore spoke with the police placed upon the petitioner the burden of explaining what was said in that

encounter, thus unconstitutionally forcing him to attempt to disprove the existence of possibly incriminating evidence.

In response, the warden submits not only that the burden of proof was not shifted by the prosecutor's question, but that "[t]he prosecutor did not ask whether the Petitioner had been interviewed," implying that the question that was propounded was not improper. Although it is true that the prosecutor did not specifically ask whether McLemore had been interviewed, he did ask, "[W]ho all did you interview?" knowing full well that Moffit had spoken with McLemore. But even if the question were improper, any error was harmless.

First, the question posed was not likely to prejudice the petitioner. The trial court had previously suppressed the petitioner's statement to the police, and the question asked by the prosecutor did not elicit any information about the statement itself other than the fact that an interview was conducted. Moreover, it is hardly news to any juror in a criminal trial that the police will attempt to question an individual arrested for an offense. Any prejudice suffered by McLemore as a result of the prosecutor's question was thus negligible at most. Furthermore, the prosecutor's question was brief and isolated and, after a short bench conference following the detective's response, the prosecutor immediately moved to another line of inquiry. Thus, there is no indication in the record that the prosecutor intentionally sought to delve into restricted subjects. Finally, the evidence against the petitioner was very strong. In fact, upon taking the stand, McLemore admitted his involvement in the criminal spree. Again, the fact that law enforcement officials spoke with

the petitioner after his arrest is hardly surprising; therefore, a question posed by the state that elicited an answer to that effect did not "so infect[ ] the trial with unfairness as to make the conviction a denial of due process." *Lundgren*, 440 F.3d at 778.

## 3. Exclusion of Witness Testimony

At trial, McLemore hoped to introduce testimony from Blake Copeland, a friend of his, regarding a conversation that Copeland had with Nathan Reid on the day before Reid and McLemore were arrested. During a jury-out offer of proof, Copeland stated:

> [Reid] – he was all hyper, and he said, man, Blake, I just got in this motherfucker's house and killed him, and he said I beat him, I beat him, I fucked him up pretty bad, he might even be dead, and then –
>
> * * * * *
>
> Yeah, I said, what, and he said, he said, yeah, man, he might – he – he might be dead. We just – I had left him, he said I left him there . . . .

The defense's obvious purpose in seeking to introduce Copeland's testimony at trial was to establish that Reid, not McLemore, was the principal actor in the beating and the murder of Manning. The trial court, however, denied the request to introduce the hearsay statements, in part because the defense failed to establish that Reid, the out-of-court declarant, was unavailable, and in part because corroborating circumstances did not clearly indicate the trustworthiness of the statements. The court also denied the request because the substance of Copeland's testimony was not made available until approximately five months after the statements were made.

McLemore now alleges that the exclusion of Copeland as a witness infringed on his constitutional right to present a defense. Because the Michigan Court of Appeals deemed the issue abandoned due to the petitioner's failure to "address the foundational requirement that the declarant be unavailable," *People v. McLemore*, No. 225562, 2002 WL 31956947, at *2 (Mich. Ct. App. Dec. 20, 2002), the warden now asserts that this issue has also been procedurally defaulted. The petitioner again identifies the ineffective assistance offered by his trial and appellate counsel as causes for the default. Given the reality that evaluation of those justifications requires an examination by this court of the merits of the claim, we once again choose to address those merits in the first instance.

The principle of law is now well established that an accused's right to present a defense "is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967). Nevertheless, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).

Copeland's proffered testimony consisted of statements allegedly made to him by Reid, who did not testify at trial. Moreover, those statements were offered by the defense solely to prove the truth of the matter asserted – namely, that Reid entered the home and assaulted Manning. Consequently, Copeland's statements were classic hearsay, which Michigan Rule of Evidence 801(c) defines as "a statement, other than one made by the

declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

Because hearsay evidence is inadmissible in Michigan courts, except as provided by the Michigan Rules of Evidence, the petitioner seeks to classify Reid's statements to Copeland as "statements against interest" that "are not excluded by the hearsay rule if the declarant is unavailable as a witness." Mich. R. Evid. 804(b)(3). Rule 804(b)(3) generally allows admission of:

> [a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

However, "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." *Id.  See also People v. Barrera*, 547 N.W.2d 280, 286 (Mich. 1996).

As recognized by the Michigan Court of Appeals in addressing this issue on McLemore's direct appeal, there are numerous grounds for rejecting the petitioner's evidentiary challenge, some based on the failure of defense counsel to pursue certain courses of action and some based on more classic inabilities to establish prejudicial harm. First, both parties recognize that "[t]he party offering the statement bears the formidable

burden of meeting the requirements of Rule 804(b)(3)." *United States v. Lowe*, 65 F.3d 1137, 1145 (4th Cir. 1995) (citations and internal quotation marks omitted). One of those requirements is that the declarant be unavailable. Mich. R. Evid. 804(b). Unfortunately for McLemore, he cannot satisfy that burden. Shortly before the beginning of the petitioner's trial, Nathan Reid entered a no-contest plea to the charges against him stemming from the same criminal episode. As a result, Reid faced no risk of self-incrimination by testifying at McLemore's trial, and defense counsel could have subpoenaed Reid as a witness had he so desired.

Second, regardless of Reid's availability as a witness, the state trial court did not abuse its discretion in concluding that the "corroborating circumstances" did not clearly indicate the trustworthiness of the statement to which Copeland was prepared to testify. Indeed, even during Copeland's offer of proof, the witness interchanged the word "I" with the word "we" in recounting Reid's alleged statement about who initially entered Manning's home and literally beat him to death.

Third, as pointed out by the Michigan Court of Appeals on direct review, if Copeland had been permitted to relate his version of Reid's statement to the jury, the result of the trial would not have been different. The state appellate court explained that "considering the prosecution's aiding and abetting theory of guilt, Copeland's proposed testimony would not have exonerated defendant from criminal responsibility, regardless of whether Reid's

statements contained the references to 'we' or 'I.'" *McLemore,* 2002 WL 31956947, at *2 n.3.

## 4. Ineffective Assistance of Trial Counsel and Appellate Counsel

McLemore lastly contends that his *trial* counsel was ineffective for failing properly to preserve or present the allegations of error that we previously identified and discussed in this opinion. He also submits that his *appellate* counsel was ineffective for failing to raise on direct appeal that claim of ineffectiveness on the part of his *trial* counsel.

In addressing any claim of ineffective assistance of counsel, we are guided by the now-familiar two-part test of *Strickland*, 466 U.S. at 687:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

We need not, however, apply *Strickland*'s principles in a mechanical fashion. As the Supreme Court has explained:

> [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim

on the ground of lack of sufficient prejudice, which we expect will often be so,
that course should be followed.

*Id.* at 697.

In this case, we opt to do exactly that. As is evident from our discussion of the jury instructions given at McLemore's trial, our examination of the prosecutor's conduct during closing argument, and our analysis of the admissibility of certain defense testimony, the petitioner has failed to prove, on the merits, any constitutional violations during the course of the state-court trial. Hence, because any alleged deficiencies in the representation offered by McLemore's trial or appellate counsel could not have prejudiced the petitioner, we also find no constitutional error related to the performance of McLemore's lawyers.

## CONCLUSION

For the reasons set out above, we AFFIRM the district court's judgment denying McLemore's petition for a writ of habeas corpus.