RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0269p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

────────────────

THOMAS DAVID RICHARDSON,

  *Petitioner-Appellant,*

*v.*

CARMEN DENISE PALMER, Warden,

  *Respondent-Appellee.*

┐
│
│
│
├  No. 18-1434
│
│
│
┘

────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:14-cv-01250—Paul Lewis Maloney, District Judge.

Argued:  August 7, 2019

Decided and Filed:  October 24, 2019

Before:  SUHRHEINRICH, CLAY, and DONALD, Circuit Judges.

────────────────

## COUNSEL

**ARGUED:**  David L. Moffitt, LAW OFFICES OF DAVID L. MOFFITT & ASSOCIATES, Bingham Farms, Michigan, for Appellant.  Linus Banghart-Linn, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.  **ON BRIEF:**  David L. Moffitt, LAW OFFICES OF DAVID L. MOFFITT & ASSOCIATES, Bingham Farms, Michigan, for Appellant.  Andrea M. Christensen-Brown, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

────────────────

## OPINION

────────────────

  BERNICE BOUIE DONALD, Circuit Judge.  In May 2008, a Michigan jury convicted Thomas Richardson of first-degree murder for killing his wife, Juanita Richardson, by causing

her to fall from a cliff in Pictured Rocks National Park.  After exhausting his state remedies, Richardson filed a habeas petition with the United States District Court for the Western District of Michigan.  Pursuant to the magistrate judge's recommendation, the district court denied the petition but granted a certificate of appealability ("COA") on Richardson's claim of prosecutorial misconduct.  This court subsequently granted an additional COA on Richardson's claims of ineffective assistance of trial and appellate counsel for failing to argue that a witness's testimony was obtained as a result of an illegal, warrantless search.

We affirm the district court's denial of Richardson's petition.  Richardson has failed to demonstrate that the Michigan Court of Appeals' rejection of his claims of prosecutorial misconduct was objectively unreasonable based on Supreme Court precedent.  Additionally, Richardson has failed to demonstrate that the state court misapplied Supreme Court precedent in finding that neither his trial nor appellate counsel was ineffective.

I.

Both Richardson and the government have adopted the underlying facts as set forth by the Michigan Court of Appeals:

> [Richardson] was convicted of killing his wife, Juanita Richardson, by causing her to fall from a cliff in Pictured Rocks National Park on June 22, 2006. Defendant initially told a park employee that the victim was missing from their "honeymoon spot" at the cliff when he returned from a visit to the restroom. After the victim's body was recovered from the rocks below the cliff, defendant gave different accounts of the event to law enforcement officers, during which he reported both that he observed the victim intentionally jump from the cliff and that he observed her accidentally fall from the cliff. After the incident, defendant also gave conflicting accounts of the event to various relatives, former and current coworkers, and other acquaintances. The medical examiner concluded that the victim's fatal injuries were equally consistent with an accidental, suicidal, or homicidal fall from the cliff. The prosecutor's theory at trial was that defendant may have choked the victim to the point of unconsciousness and then dropped her over the edge, or used some implement to knock her over the edge. The defense theory was that the victim accidentally fell from the cliff.

*People v. Richardson*, No. 287857, 2010 WL 4320392, at *1 (Mich. Ct. App. Nov. 2, 2010). Because our analysis will involve whether Richardson was actually prejudiced by the admission

of certain evidence that he alleges was the result of a Fourth Amendment violation, however, a more in-depth summary is necessary.

Richardson was charged with first-degree murder and manslaughter.[1]  The prosecution's theory was that Richardson was a womanizer, who had previously separated from his wife, Juanita, to be with another woman.  He treated his wife poorly, openly insulting her, committing acts of domestic violence, giving her a black eye, and threatening to kill her.  He was, at the time of his wife's death, actively pursuing at least one other woman, Keli Brophy, whom he had asked to "wait for him" and told he could "take care of."  Brophy, however, had told Richardson that if he wanted to be together, then his "ex-wife couldn't be alive."  Richardson told Brophy that his wife had breast cancer, which she did not, and that she would be dead by Christmas, which she was.

Shortly before their fateful trip to their "honeymoon spot," Juanita reported that her husband had "been ragging on" her to "get a will."  Richardson requested weekend appointments to meet with attorneys to draft a will the weekend before their trip.  As soon as Richardson learned that a will was not necessary to avoid probate in the event of one of their deaths because they owned their property jointly, Richardson's insistence on having the wills drafted "completely dissipated."

On June 22, 2006, Richardson and his wife, Juanita, travelled to their "honeymoon spot" at Pictured Rocks National Lakeshore on the Upper Peninsula in Michigan.  In the time after Juanita's death, Richardson described a variety of possible scenarios that could have led to her fall.  In one, he went to the restroom, only to come back and see her body on the rocks below.  In another, he returned from the restroom to find her standing on the cliff.  "[A]s he approached the cliff site, their eyes met, she said something about – about God, and turned and jumped off of the cliff."  In yet another version, he returned to find his wife "standing at the edge of the cliff" before she "just kind of fell over."  In additional variations of these accounts, Richardson

---

[1]Richardson took "no issue with the facts as summarized by the magistrate judge."  (Order Adopting R. & R., R. 40, PageID 11937.)  In a 211-page Report and Recommendation, the magistrate judge thoroughly described and summarized the evidence and witness testimony presented at trial.  *Richardson v. Palmer*, No. 1:14-CV-1250, 2017 WL 9605116 (W.D. Mich. Dec. 19, 2017).

sometimes passed or blacked out after seeing Juanita at the bottom of the cliff. In explaining these inconsistent stories, Richardson claimed to suffer from memory loss due to a work-place injury. Many witnesses had never observed any other evidence of memory loss, nor heard Richardson mention it before Juanita's death. In discussing Richardson's inconsistent stories, the prosecution's expert witness stated that, based on her review of the research, "in reports of dissociative amnesia, typically once the memory returns, it's there, it's returned." That witness found that it led to "a conclusion that telling different stories at different times is a matter of choice, not a matter of memory suddenly disappearing again."

After Juanita's death, Richardson began pursuing other women more aggressively. According to testimony from Brophy and her daughter, Richardson appeared uninvited at Brophy's residence. As a gift, he even brought a plant from Juanita's funeral. An intelligence analyst testified that there were fifty-two calls between Richardson and Brophy in the weeks following Juanita's death. Also, according to testimony from Tammy Sian, she and Richardson became involved in August 2006, two months after his wife's death. Additionally, "several weeks after Juanita Richardson's death," Richardson approached the branch manager of his bank to discuss "negotiating memorial fund checks that he had received." Apparently, he had told other employees at the bank that he "wanted to cash" the memorial checks and was told that they "couldn't just be cashed, they needed to go into a memorial fund set up specific[ally] for that." Still, Richardson asked a bank employee if he could take her out to dinner, within months of his wife's death. When his offer was rejected, he sent the employee a card with his phone number. Finally, two months after Juanita's death, Richardson unknowingly met an undercover agent when getting dinner with a larger group. Four months after Juanita's death, after exhibiting a "high" level of interest in the undercover agent and "regularly" suggesting that the two meet, Richardson met with the agent alone.

After being charged, Richardson was housed in a cell with two witnesses, both of whom testified that he had said that the prosecuting attorney would "be the next bitch to go off a cliff."[2]

---

[2]This threat was made before either witness had entered into an agreement with the government to wear a recording device or act at the direction of law enforcement.

The defense, meanwhile, argued that Juanita had accidentally fallen off the cliff. Defense witnesses testified that Richardson and Juanita had a good marriage and "liked to argue, but they loved to make up." Richardson was active in a bible study group. Juanita had allegedly confided in a friend from church that she had previously had an affair.

The magistrate judge's thorough and well-reasoned explanation of the case contains countless other examples of the kinds of evidence discussed above. Still, such a summary is appropriate for the necessary consideration of whether Richardson was prejudiced by his allegedly ineffective counsel.

In the end, the jury found Richardson guilty of first-degree murder. He was sentenced to life in prison without the possibility of parole. The Michigan Court of Appeals affirmed his conviction, as did the Michigan Supreme Court. Richardson subsequently moved for relief from judgment. The trial court denied the motion. Both the Michigan Court of Appeals and Michigan Supreme Court denied Petitioner leave to appeal, finding that he "fail[ed] to meet the burden of establishing entitlement to relief under MCR 6.508(D)."[3] *People v. Richardson*, No. 316802, Order (Mich. Ct. App. Dec. 27, 2013); *People v. Richardson*, 856 N.W.2d 12 (Mich. 2014).

Richardson sought a writ of habeas corpus in the Western District of Michigan pursuant to 28 U.S.C. § 2254, asserting fourteen claims of relief that he had previously raised. The magistrate judge recommended denying relief, and the district court adopted the magistrate's report over Richardson's objections. In doing so, however, the court granted a COA on Richardson's allegation of prosecutorial misconduct. This Court subsequently expanded that COA to include the additional issue of whether trial and appellate counsel were ineffective for failing to argue that some testimony described above was obtained as a result of an illegal, warrantless search.

This panel is therefore considering two discrete claims: (1) Whether the Michigan court's rejection of Richardson's claim of prosecutorial misconduct was objectively unreasonable; and

---

[3]Mich. Ct. R 6.508(D) places the burden on defendants to establish that they are entitled to the requested relief based upon, among other things, a retroactive change in law or prejudice from irregularities that either could not be argued on appeal in a prior motion or for which the defendant has good cause for failing to argue.

(2) whether Richardson's trial and appellate counsel performed ineffectively by failing to argue that Tammy Sian's testimony was obtained as a result of an illegal, warrantless search.

Like the state trial, appellate, and supreme courts, as well as the federal magistrate and district judges before us, we find that Richardson's claims of prosecutorial misconduct are meritless and that the state appellate court was not objectively unreasonable to reject the argument. Further, we find that trial and appellate counsel were not ineffective for failing to argue that Tammy Sian's testimony was obtained through a warrantless search, and even if counsel had been ineffective, Richardson was not prejudiced.

II.

As a preliminary matter, both the government and Richardson claim that the other party is now attempting to make arguments that have been procedurally defaulted or waived. The government argues that several of Richardson's claims of prosecutorial misconduct, as well as his claim of ineffective assistance of counsel, have been procedurally defaulted and should not be considered by this panel. Richardson, meanwhile, argues that the government has waived the argument of procedural default by failing to object to the magistrate judge's recommendation, which explicitly declined to consider procedural default.

In the context of a habeas petition, procedural default bars federal review when a state court has declined to address a federal claim due to the petitioner's noncompliance with a state procedural requirement. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). The default is an adequate and independent state ground upon which the state decision rests. *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017). If a petitioner fails to raise a federal claim on direct appeal, the claim is procedurally defaulted in federal court. *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). If a claim has been procedurally defaulted, then habeas review is only available if a "petitioner can demonstrate (1) cause for the default and actual prejudice [resulting therefrom], or (2) that the [court's] failure to consider the [defaulted argument would] result in a fundamental miscarriage of justice." *Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004) (citing *Coleman*, 501 U.S. at 749-50).

Though the Michigan Court of Appeals determined that some of Richardson's arguments had been defaulted due to his failure to assert the issue during the trial, the court still considered the issues. *Richardson*, 2010 WL 4320392, at *8-15. The magistrate judge decided that "[r]ather than attempt to navigate these questions of procedural default," the court would "simply address Petitioner's claim on the merits." *Richardson*, 2017 WL 9605116, at *58. Faced with the conflicting state appellate record, we agree with the magistrate judge that "[a]n analysis of the merits of the petitioner's substantive claims presents a more straightforward ground for decision." *Id.* (quoting *McLemore v. Bell*, 503 F. App'x 398, 404 (6th Cir. 2012)). Because we find that Richardson is not entitled to relief, the government is not prejudiced by our considering Richardson's arguments.

### III.

We review the district court's decision de novo. *Souter v. Jones*, 395 F.3d 577, 584 (6th Cir. 2005). Under the Antiterrorism and Effective Death Penalty Act (AEDPA), an application for writ of habeas corpus shall only be granted if the state court's determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court's application of federal law is unreasonable only if the petitioner can demonstrate that it is "objectively unreasonable, not merely wrong[.]" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). The court's reasoning must be "so lacking in justification" that the error is "beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The standard is "intentionally difficult to meet." *Woods*, 135 S. Ct. at 1376 (citation and internal quotations marks omitted). "[T]he central inquiry is whether the state court decision was objectively unreasonable and not simply erroneous or incorrect." *Harris v. Haeberlin*, 526 F.3d 903, 910 (6th Cir. 2008) (citation and internal quotations marks omitted).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary . . . and a decision adjudicated on the merits in a state court and based

on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). If a federal claim was presented to a state court and the court subsequently denied relief, "it may be presumed that the state court adjudicated the claim on the merits[.]" *Harrington*, 562 U.S. at 99.

IV.

We first consider whether the Michigan Court of Appeals' rejection of Richardson's claim of prosecutorial misconduct was objectively unreasonable. Richardson argues that the prosecutor committed numerous acts of misconduct, which denied him the right to a fair trial. Each of these alleged instances is considered below.

Under § 2254(d)(1), Richardson argues that the state court's adjudication was "contrary to" or involved an "unreasonable application of" clearly-established Supreme Court precedent. 28 U.S.C. § 2254. Richardson argues that all of this conduct violated the standard of *Darden v. Wainwright*, "which explained that a prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). Therefore, we will consider the "fairness of the trial," which is the "touchstone of due process analysis in cases of alleged prosecutorial misconduct," not the "culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

A.

Richardson's first allegation of prosecutorial misconduct stems from the prosecutor's reference to the September 11th terrorist attacks during jury selection. Richardson argues that "the prosecutor necessarily compared Richardson to the 9/11 terrorists by arguing that the same type of circumstantial evidence that proved that the 9/11 attacks were committed by terrorists proved that Richardson killed his wife." (Reply Br., at 9.)

Much of the evidence submitted to the jury, as summarized above, was circumstantial. During the jury selection process, when attempting to ascertain whether potential jurors could

understand the merits of circumstantial evidence, the prosecutor made the familiar comparison to being able to determine that it is raining outside by seeing the circumstantial evidence of someone come in from outside wearing a raincoat covered in droplets of water. *Richardson*, 2017 WL 9605116, at *63. The prosecutor then went on to make the ill-advised comparison of knowing that the World Trade Center had intentionally been attacked through the circumstantial evidence of seeing the second plane hit. *Id.* at *63-64. When that example caused the discussion to get off track, the prosecutor quickly returned to the rain example. *Id.* at *64. The prosecutor was attempting to demonstrate that "circumstantial evidence plays this hidden role in our lives, that we use it on a daily basis[.]" *Id.* at *65. When one potential juror said that it "seemed pretty obvious" that the attacks on 9/11 were intentional, the prosecutor clarified that the juror "would agree that circumstantial evidence can be very compelling[.]" *Id.* at *67. The prosecutor returned to the example during closing argument, explaining that the "9/11 analogies are about the presence and the power of circumstantial evidence in our lives." *Id.* at *70.

As the Michigan Court of Appeals noted, "the prosecutor's references to the World Trade Center attack during voir dire were made in the context of exploring the concepts of circumstantial evidence and reasonable doubt with the prospective jurors, to determine whether they were capable of understanding and applying those concepts at trial." *Richardson*, 2010 WL 4320392, at *9.

Though the prosecutor's example was unnecessarily provocative, the state court's finding that the example was permissible was not objectively unreasonable. The references were limited to voir dire and closing argument and did not come up outside of explaining circumstantial evidence. Such statements do not rise to the standard established by the Court in *Darden*. Therefore, the record cannot support a finding that the trial was so infected with improper comments that Richardson's due process rights were violated.

B.

Richardson likewise argues that the prosecution committed misconduct when, during jury selection and closing argument, it referred to two notorious murders. Specifically, the prosecutor referenced the Moilanen murder, in which a husband shot his wife and made it look like a

hunting accident, to make the point that a murder might be staged to look like an accident. *Richardson*, 2017 WL 9605116, at \*71. Additionally, the prosecutor referenced Scott Peterson, who killed his pregnant wife, to make the point that even notorious criminals "have people who support them. . . despite overwhelming evidence to the contrary[.]" *Id.* The prosecutor subsequently requested that the jury not "convict [Richardson] because of my references to 9/11 or other high profile murder cases[.]" (Trial Tr. 25, R. 14-51, PageID 9611.)

Richardson argues that the state court engaged in an unreasonable determination of the facts in light of the evidence presented. Considering the overwhelming evidence at trial, we cannot say that the state court's decision was unreasonable. The state court determined that, although "[t]he prosecutor could have made this same argument by using the hypothetical of a husband shooting his wife, . . . . the trial court's jury instructions were sufficient to cure any perceived prejudice." *Richardson*, 2010 WL 4320392 at \*10. Additionally, the state court found that "[c]onsidering the overwhelming, properly admitted evidence of defendant's guilt and the trial court's instructions to the jury, any prejudicial implications of the prosecutor's statements were sufficiently mitigated so as not to deprive defendant of a fair trial." *Id.* We agree.

Further, Richardson's legal arguments misunderstand the applicable standard of review. Richardson argues that the state court misapplied Supreme Court precedent by failing to follow *Chapman v. California*, 386 U.S. 18, 21 (1967), "which held that the prosecutor has the burden of proving, beyond a reasonable doubt, that the error was harmless." (Appellant's Br., at 24.) That case made no such assertion. Rather, it simply put forth the legal standard that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24. The state court determined that, even if the references to notorious criminals could prejudice the defendant, "the error was harmless because it is not more probable than not that the brief questioning, which did not directly suggest any comparison between defendant and a notorious criminal, affected the outcome of the trial." *Richardson*, 2010 WL 4320392, at \*10. Under the highly-deferential AEDPA standard, we do not find that the state court resolved this issue unreasonably. As noted, there was abundant circumstantial evidence linking Richardson to the murder, the prosecutor attempted to mitigate any undue effects from her comments, and there is no allegation that the

trial court did not properly instruct the jury. Therefore, while the prosecutor's comments might have been imprudent at certain points, Richardson was not denied a fair trial.

C.

Third, Richardson argues that the prosecutor purposefully attempted to "arouse the sympathy of the jurors and compel them to convict, despite any doubts they may have had." (Appellant's Br., at 25.) In closing, the prosecutor said that Juanita Richardson likely experienced terror and betrayal before her death and insinuated that her own children were then betraying her by testifying for the defendant. *Richardson*, 2017 WL 9605116, at *72. The Michigan Court of Appeals first noted that "a prosecutor need not state her arguments in the blandest of terms[,]" and further determined that, in regard to the children, the prosecutor's statements were largely attacking their credibility as witnesses. *Richardson*, 2010 WL 4320392, at *11. Additionally, the trial court instructed the members of the jury that they were not to let sympathy or passion influence their decision. *Id.* The court held that the remarks "did not deprive [Richardson] of a fair trial." *Id.* We cannot say that the court's determination was objectively unreasonable or that the prosecution's statements infected the trial under *Darden*.

D.

Next, according to Richardson, the prosecutor made inappropriate references to Richardson's exercise of his constitutional rights to remain silent and consult with counsel. (Appellant's Br., at 26.) Specifically, when questioning one of Richardson's close acquaintances, the prosecutor asked whether Richardson had ever told him about a search warrant. The acquaintance told the prosecutor about an incident in which Richardson returned to his home to find three police cars in the driveway. Richardson explained to the acquaintance that he drove away and parked behind his home's pole barn, where he called his attorney to see whether the police had a warrant and seek his counsel's advice. Additionally, during her closing argument, the prosecutor noted that, regarding Richardson's right to appeal, "an army of appellate lawyers will flyspeck everything I have said." *Richardson*, 2017 WL 9605116, at *74.

Regarding the evidence of Richardson driving away from the police to call his attorney, the state court found that the record did not support his claim that the prosecutor's arguments

were inappropriate.  A prosecutor may not imply that a defendant's decision to meet with counsel implies guilt.  *Sizemore v. Fletcher*, 921 F.2d 667, 671 (6th Cir. 1990).  The state appellate court found that, although the prosecutor did elicit testimony that Richardson had called his attorney, the purpose of the questioning was to elicit testimony concerning Richardson's consciousness of guilt, namely, that upon seeing police officers in his driveway, he hid because he assumed that they would likely have an arrest warrant.  *Richardson*, 2010 WL 4320392, at *11.

We agree with the state appellate court and do not find their decision objectively unreasonable.  Though it would be inappropriate for a prosecutor to argue that Richardson called his attorney because he was guilty, the record demonstrates that the prosecutor sought to establish that Richardson was conscious of his guilt, which was demonstrated by his fleeing the scene and hiding, rather than simply addressing the police officers.

Further, we agree with the state appellate court that Richardson "failed to show that the prosecutor's brief remark in closing argument regarding the possibility that her conduct would be flyspecked in a future appeal infringed on his right to counsel or was prejudicial."  *Id.* at *12.  Richardson has failed to demonstrate that this singular reference violated his rights or infected the trial as a whole.  Therefore, the state court's decision was not an improper application under *Darden*.

E.

Richardson alleges that "the prosecutor presented overwhelming evidence of Petitioner's bad character, . . . such as the testimony that Petitioner was an unproductive and complaining employee, . . . mentally and verbally abusive to his wife, and that he pursued other women." (Appellant's Br., at 29.)  Richardson argues that the state court did not address this claim and that therefore we should review it de novo.  The state appellate court considered many of the specific instances that Richardson now cites in his petition, including evidence "depicting him as a 'misogynist,'" which the state appellate court found admissible as relevant statements made by the defendant.  *Richardson*, 2010 WL 4320392, at *2-4.  The state appellate court similarly found that evidence of Richardson's previous affairs, including love letters, were admissible to

"establish the long-term nature of the marital discord and defendant's discontent with the marriage[.]" *Id.* at *4. The state court also found that evidence of Richardson's previous work was relevant because it was used to rebut his claim that he had suffered from a traumatic brain injury that caused lapses in memory. *Id.* at *5. Finally, evidence from former coworkers was relevant to admit Richardson's previous statements about his marriage, his relationship with Juanita, and the circumstances surrounding her death. *Id.*

Richardson also argues that the prosecutor made inappropriate statements regarding Richardson's religious beliefs in her closing. According to Richardson, such statements were inappropriate because "[a] person who disrespects God is, logically, more likely to be the type of person who could commit murder." (Appellant's Br., at 31.) Additionally, the prosecutor referred to Kelli Brophy's religious beliefs. Brophy and Richardson would talk nearly every night to discuss "the Bible or scriptures." *Richardson*, 2017 WL 9605116, at *75. Brophy told Richardson that if she ever wanted to get into a relationship with someone, she did not "want the person to have any baggage, have any ex-wives." *Id.* at *39. More directly, Brophy told Richardson that this meant that his "ex-wife couldn't be alive." *Id.*

Without getting into an unnecessary and inappropriate analysis of whether one's religious beliefs can in fact be in any way linked to a predilection to commit violent crimes, the state appellate court correctly found that "the remark did not concern a witness's religious beliefs, but rather [Richardson's] alleged motive." *Richardson*, 2010 WL 4320392, at *13. Specifically, the prosecution sought to prove that Richardson would have wanted to kill Juanita to be with Brophy and because it would allow him to "maintain his image as a morally and spiritually superior person, one who was opposed to divorce." *Id.* Additionally, Richardson had put forth witness testimony concerning his religious beliefs and his involvement in assorted religious groups. "Examined in this context, the challenged remark was a fair response to the defense evidence." *Id.* The state court's determination was not objectively unreasonable in light of the prosecutorial statements and the context in which they were made.**4**

---

**4**Insofar as the state appellate court did not consider all of Richardson's arguments regarding alleged character evidence, the court found that "many of defendant's claims of error are unpreserved" because Richardson did not timely object to their admission or objected on different grounds than those he advanced on appeal.

F.

Richardson points to a number of instances in which he believes that the prosecutor denigrated defense counsel. This includes the prosecutor saying that "even the defense doesn't believe the defendant," because a computerized simulation of defense's theory of the case actually contradicted Richardson's own account of the incident; referencing that the jury might witness "gratuitous nastiness" in the cross-examination of prosecution witnesses because defense counsel told the jury that it should expect "[r]igorous cross-examination"; explaining that Richardson had been charged with both first-degree murder and manslaughter, so that the defense could not argue that Richardson killed Juanita under an impulse, which would not be included in murder; and saying that the defense's theory failed the "fall-down-laughing test." (Appellant's Br., at 32-36.)

The state appellate court found many of these statements to be "inartfully phrased," but fair commentary in the context, often concerning conflicts of evidence. *Richardson*, 2010 WL 4320392, at \*14. The prosecutor's allusion to the "gratuitous nastiness" of cross-examination was made in response to defense's comment to the jury that there would be "rigorous cross-examination." It was therefore in response to posturing on the part of the defense. Moreover, we fail to see how Richardson could have been prejudiced by the prosecutor explaining to the jury why, in a case that was largely based on circumstantial evidence of premeditation and intent, a defendant was charged with manslaughter, which would imply that there had been no premeditation.

Finally, Richardson posits that he was prejudiced by the prosecutor inappropriately referring to Richardson's expert witness as a "defense whore," an insult that the prosecutor explained is not "a gender-based slur," but "simply refers to opinions being for sale." *Richardson*, 2017 WL 9605116, at \*78. After a late objection, the trial court instructed the prosecution to refrain from using such derogatory terminology. The state appellate court "agree[d] with [Richardson] and the trial court that the prosecutor's choice of words was in bad taste and not befitting of a courtroom setting." *Richardson*, 2010 WL 4320392, at \*14. Still, the

---

*Richardson*, 2010 WL 4320392, at \*1. Therefore, any claim that the state appellate court did not consider was not properly exhausted and need not be considered here.

court found that Richardson had "not established that he was denied a fair trial as a result of the statement." *Id.*

We agree. On appeal, Richardson argues that this statement denied him a fair trial because it was an inappropriate attempt to mislead the jury and made all the worse because it was directed at the expert witness upon whose testimony Richardson relied to attempt to explain his many inconsistent statements regarding Juanita's death. Under Michigan law, "the prosecution is free to argue from the evidence presented that an expert witness had a financial motive to testify at trial." *People v. Unger*, 278 Mich. App. 210, 239 (Mich. Ct. App. 2008). It is true that the prosecutor's choice of words was ill-advised, but Richardson's only argument is that the specific use of the word "whore" was so inappropriate that it infected the entire trial. Such arguments fail to demonstrate that the prosecution's inappropriate comment, addressed by the trial court at the time, infected the trial as a whole as required by *Darden*.

## G.

Finally, Richardson argues that the prosecution inappropriately complained of court rulings in order to imply the existence of evidence of guilt that was not in the record. For example, the prosecutor stated that the jury could not visit the scene of the crime, the courtroom could not be cleared so that the jury could better hear a tape recording, and that some medical professionals who provided care to Juanita could not give their full thoughts on Richardson. The Michigan Court of Appeals found that, although "the prosecutor's expressed preferences were not relevant and unnecessary, [it] fail[ed] to see how [Richardson] was prejudiced by the comments." *Richardson*, 2010 WL 4320392, at *15. On appeal, Richardson contends that the prosecution was essentially arguing "that the evidence made inadmissible by the rulings was evidence of Petitioner's guilt, which implied that the prosecutor had some personal knowledge of facts not in evidence of Petitioner's guilt, which is indisputably fundamentally unfair." (Appellant's Br., at 38.) Richardson's argument is unavailing.

The prosecutor did not allude to any personal knowledge of Richardson's guilt when she said that she wished that the jury could visit the scene of the crime. Nor did she allude to personal knowledge when she told the jury that, because a recorded tape was going to be played

in the open courtroom, "you really need to tune out whatever is going on in the courtroom and listen to what's on this tape and what's not on this tape." *Richardson*, 2017 WL 9605116, at *78. If anything, such a statement requests that the jury pay close attention to the recording, which was properly admitted. Finally, the prosecutor did not allude to personal knowledge when she explained that the jury would be hearing from first-responders and primary care providers who had actually treated Richardson, but who could not give a final opinion on what they thought of Richardson's guilt. Such a statement accurately explains the function of a lay witness as compared to an expert witness. Under the AEDPA standard, it was certainly not objectively unreasonable for the state appellate court to find that the trial court's instructions were sufficient to ensure that the jury only considered evidence that was properly admitted.

## H.

In summation and looking at the cumulative effect of the prosecution's actions, we agree with the Michigan Court of Appeals that Richardson "has not shown any actual errors that, viewed singularly or cumulatively, deprived him of a fair trial." *Richardson*, 2010 WL 4320392, at *15. But, we do not do so lightly. As the state and federal courts that have considered this case before us have explained, and the above discussion makes evident, there were numerous incidents in which the prosecutor ill-advisedly chose to editorialize, to make irrelevant observations, and to use imprudent language.

"The primary duty of the prosecutor is to seek justice within the bounds of the law, not merely to convict . . . . The prosecutor should . . . respect the constitutional and legal rights of all persons, including suspects and defendants . . . . The prosecutor should avoid an appearance of impropriety in performing the prosecution function." Am. Bar Ass'n, Criminal Justice Standards for the Prosecution Function, Standard 3-1.2(b)-(c) (4th ed. 2018). The trial judge must then act as a guarantor of the prosecutor's fairness. "A trial judge should maintain order and decorum in judicial proceedings. The trial judge has the obligation to use his or her judicial power to prevent distractions from and disruptions of the trial." Am. Bar Ass'n, Special Functions of the Trial Judge, Standard 6-3.5(a) (3d ed. 2000).

In this case, the prosecutor failed in her duty by abdicating her role as minister of justice, instead focusing on winning by any means necessary. Similarly, the trial judge failed to act as a check on the prosecutor's action by serving as a neutral arbiter of justice. Prosecutors are, of course, agents of the public. They act on the public's behalf and, in so doing, act with the public's permission. There can be no doubt that, in this case, the prosecutor abused that public trust and, in so doing, potentially undermined the public's trust in all prosecutors.

Our analysis requires that we consider this prosecutor's misdeeds against the evidence of the criminal defendant's guilt. Lest our warning go unheeded, let us be explicit, prosecutors should not feel that an overabundance of evidence of guilt grants a license to be flippant with their ethical obligations.

We cannot overstate our discomfort with the prosecutor's misdeeds. Whether they were intentional misinterpretations or doltish distortions, they were an afront on the court's impartiality, a waste of its resources, and an insult to its independence. In calling a defense witness a "whore," the prosecutor not only insulted and demeaned an expert, but disrespected the jury, betrayed the public trust, and wasted the time of this court and the many courts before it with her garish antics.

Yet, the purpose of these habeas proceedings is not "punishment of society for the misdeeds of the prosecutor[,] but avoidance of an unfair trial to the accused." *Smith*, 455 U.S. at 219 (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). We agree with the other courts that have considered whether Richardson was afforded a fair trial. Like other courts, we find that while the trial was not perfect, and despite the prosecutor's misdeeds, Richardson received a fair trial due to the overwhelming evidence of his guilt. In the end, the prosecutor's precognition that appellate lawyers would pick through everything she said was accurate, and she should have been more tactful when trying this case.[5]

---

[5]Richardson notes that "[n]ot surprisingly, the prosecutor in this case has been previously reprimanded for comments similar to the ones she made here" and cites previous incidents. (Appellant's Br., at 39.) For the purposes of our review, however, we only consider the overall fairness of the trial. *See Smith*, 455 U.S. at 219 ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, *not the culpability of the prosecutor*.") (emphasis added).

V.

This court expanded Richardson's COA to consider whether his trial and appellate counsel performed ineffectively for failing to argue that the testimony of Tammy Sian was obtained as a result of an illegal, warrantless search. Richardson met Sian two months after his wife's death. The two spoke daily, and Richardson began regularly spending the night with Sian. Sian told police that she and Richardson had a sexual relationship, but that Richardson did not want to be seen with her in public "because he was worried about police surveillance and the police following him." *Richardson*, 2017 WL 9605116, at *46. According to Sian, Richardson was great with her and her children and had even said that he would consider marrying her at some point.

The authorities discovered Sian through the use of a GPS device without a warrant. In his habeas petition, Richardson claimed that "because placement of the GPS device on his vehicle violated his Fourth Amendment rights, the introduction of Sian's testimony entitle[d] him to habeas relief." *Id.* at *88. The district court rejected the argument. *Id.* at *89. The court found that Richardson was able to assert his Fourth Amendment claims in state court and that, under *Stone v. Powell*, "a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial," if the state court provided the opportunity for full and fair litigation of the claim. *Id.* (quoting 428 U.S. 465, 494 (1976)). "[Richardson's] attorney acknowledged that he was, in fact, timely provided a police report indicating that a tracking device had been placed on Petitioner's vehicle." *Id.* at *88.

Additionally, the district court rejected Richardson's arguments that his trial counsel was ineffective for failing to question a potential witness at trial, failing to object to the trial court's refusal to provide a special jury instruction, and failing to request that the jury not conduct experiments during their deliberations. *Id.* at *95-100. Considering appellate counsel, the magistrate judge found that because Richardson "failed to establish that his trial counsel rendered ineffective assistance, Petitioner cannot establish that he was prejudiced by his appellate counsel's failure to request a hearing regarding such." *Id.* at *101.

In granting the expanded COA, however, we noted that Richardson could raise the fact that counsel performed ineffectively by failing to raise the merits of the Fourth Amendment violation below. These are two separate issues: a claim that the prosecution violated his Fourth Amendment rights and a claim that his counsel was ineffective for failing to make that argument below. In *Kimmelman v. Morrison*, the Supreme Court held that *Stone*'s restrictions on federal habeas review of Fourth Amendment claims do not apply to Sixth Amendment claims of ineffective assistance of counsel, even where counsel was allegedly ineffective for failing to bring a Fourth Amendment claim. 477 U.S. 365, 382-83 (1986).

Richardson mischaracterizes the issue on which we granted his COA, arguing that we must consider whether trial counsel was ineffective for failing to investigate the GPS evidence, which would have revealed that the police did not have a warrant. According to Richardson, trial counsel was ineffective when it received the police report indicating that a tracking device had been used but failed to investigate whether a warrant was secured that permitted the tracking device. Our inquiry, however, is narrower: whether trial and appellate counsels were ineffective for failing to argue that Sian's testimony was obtained in violation of the Fourth Amendment.

## A.

Richardson has failed to establish that his trial counsel was ineffective for failing to argue that Tammy Sian's testimony was admitted in violation of his Fourth Amendment rights.[6] In order to prove that his trial counsel was ineffective, Richardson must demonstrate both that his trial counsel's performance was deficient and that he was prejudiced by said deficiencies. *Premo v. Moore*, 562 U.S. 115, 121 (2011). "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland v. Washington*, 466 U.S. 668, 690 (1984). Regarding performance, Richardson must demonstrate that his counsel's representation

---

[6]As noted previously, the government argues that many of Richardson's claims are procedurally defaulted, including this one. The trial court found that Richardson's underlying claim, that the evidence was admitted in violation of his Fourth Amendment rights, was procedurally defaulted, while the district court found that the Fourth Amendment claim was inappropriate in a habeas proceeding. Neither of these findings, however, address the issue of whether his trial and appellate counsel were ineffective for failing to raise the argument. Therefore, considering whether counsel was ineffective offers a more straightforward analysis.

"fell below an objective standard of reasonableness." *Id.* at 688.  Regarding prejudice, Richardson must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Premo*, 562 U.S. at 122 (citation and internal quotation marks omitted).  He must prove that his counsel's error was so egregious that it "infect[ed] [his] entire trial with error of constitutional dimensions." *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).  "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689).

Additionally, not only does Richardson's claim face the difficulties of *Strickland*, but also our review is once again limited under AEDPA to consider whether the state court acted objectively unreasonably under Supreme Court precedent in finding that trial counsel was not ineffective.  The state court considered trial counsel's effectiveness in its opinion and order regarding post-conviction relief and found that Richardson had failed to demonstrate his trial counsel was ineffective.  "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (internal citations omitted).  Therefore, the Supreme Court has warned that courts must be careful not to equate the meaning of unreasonableness under *Strickland* with that under § 2254(d). *Id.*  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Adding to Richardson's burden with the standard of review, the Supreme Court explained in *Kimmelman* that "[w]here defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious *and* that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." 477 U.S. at 375 (emphasis added).

Therefore, under AEDPA, we look to see whether it was objectively unreasonable under Supreme Court precedent for the state court to deny Richardson's claim of ineffective assistance of counsel. In making that determination, we look to whether Richardson has demonstrated that his counsel's performance was deficient under *Strickland*. We then consider whether Richardson was prejudiced by the alleged deficiencies, which requires that Richardson demonstrate that his Fourth Amendment claim would have been meritorious and, but for Sian's testimony being admitted, there is a reasonable probability that he would have been found not guilty. With such a demanding standard of review, it is perhaps of no surprise that Richardson fails to establish that his counsel was ineffective.

1.

Richardson argues that "trial counsel was ineffective for failing to request discovery of reports regarding a GPS tracking device that he knew, from a police report given to him a year before trial, that police placed on Petitioner's car[.]" (Appellant's Br., at 48.) But, defense counsel cannot be deemed ineffective for failing to make an argument that would have been futile. *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000).

Although the Supreme Court held in *United States v. Jones*, 565 U.S. 400, 404 (2012), "that the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search,'" that opinion was issued six months after Richardson's direct appeal concluded. Therefore, it could not have been clearly established that the warrantless use of a GPS device violated the Fourth Amendment. Richardson has cited no evidence that the *Jones* decision applies retroactively. He instead argues that trial counsel was "unreasonable because he failed to *investigate* and *discover* the warrantless GPS tracking and all the evidence it generated (*not* for failing to file a motion to suppress that information)[.]" (Reply Br., at 27.) Richardson's COA, however, was granted with respect to whether trial and appellate counsel performed ineffectively for failing to argue that the testimony of Tammy Sian was obtained as a result of an illegal, warrantless search.

We need not decide whether the *Jones* decision is retroactive. It is enough that Richardson has failed to demonstrate how his attorney's performance was deficient. He certainly has not demonstrated that the claim would have been meritorious under *Kimmelman*.

2.

Even if Richardson could demonstrate that his counsel was deficient for failing to make an argument that may have been futile at the time of his trial, however, he cannot demonstrate that he was prejudiced by his trial counsel's performance, let alone that, but for his attorney's failure to challenge the Sian testimony as a Fourth Amendment violation, there is a reasonable probability that the result would have been different, as required under *Kimmelman*. 477 U.S. at 375.

Richardson argues that there is a reasonable probability that the jury verdict would have been different because trial counsel would have been able to suppress Tammy Sian's testimony, which he argues was the "only prosecution witness to testify that Petitioner engaged in a romantic and sexual relationship only a month after the death of his wife[,]" (Appellant's Br., at 54), and would have been able to rebut the prosecution's theory that Richardson visited Brophy after his wife's death. Richardson has not demonstrated that either instance was likely to change the jury's decision.

Considering Tammy Sian's testimony, it is true that she was sexually involved with Richardson shortly after his wife's death. But, even if she had not been permitted to testify, Richardson pursued other women romantically. Richardson asked a bank employee out to dinner while trying to navigate how to cash checks that were intended for memorial funds. He expressed a high level of interest in meeting with a woman he had met through mutual friends, not knowing that she was an undercover agent. Regarding whether Richardson visited Brophy, the jury heard from Brophy herself, who testified that Richardson had visited her and given her a flower from his wife's funeral. Given Brophy's testimony, corroborated by her daughter's testimony, and the evidence that there were fifty-two calls between Richardson and Brophy in the weeks following Juanita's death, Richardson has failed to show a reasonable probability that the jury's decision would have been different.

This is all without considering other evidence, such as Richardson's statements to his cell-mates threatening the prosecutor, his seeking out an attorney to draft a will before his trip with Juanita to their "honeymoon spot," his inconsistent stories regarding Juanita's death, his threatening of his wife, and much more.

## B.

Finally, Richardson argues that his appellate counsel was ineffective for failing to argue that Sian's testimony was obtained as the result of an illegal search. Appellate counsel's assistance is assessed under the same *Strickland* two-part standard discussed above. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Once again Richardson attempts to broaden the scope of our inquiry under the COA, arguing that appellate counsel was ineffective for failing to argue that trial counsel was ineffective. We are limited, however, to the inquiry discussed above.

Richardson must demonstrate that his appellate counsel was objectively deficient for failing to raise the Fourth Amendment argument. He must then demonstrate that "but for his counsel's unreasonable failure . . ., he would have prevailed on his appeal." *Robbins*, 528 U.S. at 285. Appellate attorneys are not required to raise every "colorable" claim. *Jones v. Barnes*, 463 U.S. 745, 754 (1983). Therefore, "[d]eclining to raise a claim on appeal . . . is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court." *Davila*, 137 S. Ct. at 2067.

Richardson's appellate attorney made five arguments on direct appeal: (1) that Richardson's due process rights were violated by the prosecutor being permitted to submit evidence of Richardson's actions over twenty years to establish him as a "misogynist" and a "jerk"; (2) that the evidence was legally insufficient; (3) that rampant prosecutorial misconduct deprived Richardson of his right to a fair trial; (4) that the attorneys with whom Richardson discussed quickly needing a will should not have been permitted to testify because of attorney-client privilege; and (5) that he was not permitted to confront the witnesses against him because he was not permitted to participate in Brophy's material witness hearing. *See generally Richardson*, 2010 WL 4320392.

Richardson now contends that all these claims, except for the prosecutorial misconduct issue that he is currently pressing, "were clearly weaker than the ineffective-assistance [of trial counsel] claim[.]" (Appellant's Br., at 61.) Richardson submitted all these same claims in the present habeas proceeding.

For the reasons discussed above pertaining to trial counsel, Richardson has likewise failed to demonstrate that his appellate counsel was ineffective for failing to argue that Sian may have been discovered in violation of his Fourth Amendment rights. Further, even if we were to consider Richardson's argument that his appellate counsel was ineffective for failing to argue that his trial counsel was ineffective, beyond the scope of the COA, the argument fails, as we have found that Richardson failed to demonstrate that trial counsel was ineffective under the Supreme Court's deferential standard articulated in *Richter* and *Strickland*.

## VI.

For the reasons set forth above, the district court's denial of Richardson's petition is **AFFIRMED**.