*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0204p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,
                                    *Plaintiff-Appellee,*

                                                                No. 09-4261
            *v.*

AARON HARVEY,
                                    *Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 08-00138-001—Michael R. Barrett, District Judge.

Argued:  June 2, 2011

Decided and Filed:  August 4, 2011

Before:  ROGERS and KETHLEDGE, Circuit Judges; RUSSELL, Chief District
Judge.[*]

_____

## COUNSEL
_____

**ARGUED:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati,
Ohio, for Appellant. Jennifer C. Barry, ASSISTANT UNITED STATES ATTORNEY,
Cincinnati, Ohio, for Appellee. **ON BRIEF:** Kevin M. Schad, FEDERAL PUBLIC
DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant.  Jennifer C. Barry,
ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellee.

_____

## OPINION
_____

       ROGERS, Circuit Judge.  A jury convicted Aaron Harvey of making a false
statement during the purchase of firearms in violation of 18 U.S.C. § 922(a)(6).
Essentially, Harvey had purchased firearms for other persons while stating that he was

_____

       [*]The Honorable Thomas B. Russell, Chief United States District Judge for the Western District
of Kentucky, sitting by designation.

1

the actual purchaser.  Harvey appeals his conviction, challenging the district court's evidentiary rulings, jury instructions, response to jury questions, and the overall sufficiency of the evidence.  Harvey also argues that the district court erred in applying a four-level sentencing enhancement for transferring a firearm with reason to believe that it would be used in connection with another felony.  *See* U.S.S.G. § 2K2.1(b)(6).  Harvey's claims do not require reversal.

I.

Harvey purchased five handguns in Cincinnati between January and August 2007.  He first went to Costello's Gun Shop on January 6 and purchased a HiPoint .38 caliber pistol.  One week later, he bought a Smith & Wesson 9 mm at Arms & Accessories, Inc.  On August 7, he went back to Costello's with two teenagers, James Perkins and Monsanna Torbet (known as "Suki"), and purchased three more firearms: an Intratec 9 mm and two Taurus .40 caliber pistols.  Each time, Harvey filled out Alcohol Tobacco & Firearms (ATF) Form 4473 representing that he was the actual purchaser of the firearms and was not purchasing them on behalf of someone else.

One by one, the guns turned up on the streets of a high-crime neighborhood in Cincinnati.  On June 18, 2007, Cincinnati police recovered the HiPoint in an abandoned building.  Then on August 24, the police arrested Perkins, a convicted felon who was carrying one of the Taurus pistols.  On December 24, the police arrested Robert Mitchell for drug trafficking and for being a felon in possession of a firearm that turned out to be the Intratec 9 mm.  And on July 10, 2008, the police found the Smith & Wesson in a trash can while investigating a double homicide.

Because the ATF forms identified Harvey as the last known purchaser of the guns, ATF Special Agent Eric Miller and Task Force Officer Michael Drexelius interviewed Harvey in March 2008.  Harvey initially told them the guns were stolen.  But after the agents showed him a photograph of Perkins and offered to help him prepare a police report, Harvey admitted purchasing the guns at Costello's for himself, Perkins, and Suki.  Harvey further admitted that immediately after they left Costello's on August 7, Perkins gave Harvey $340 for one of the Taurus pistols; that Harvey had seen Suki with the other

Taurus and the Intratec 9 mm while Suki was selling crack cocaine; and that Suki had later "tossed" those guns while being chased by the police.

In December 2008, after the Smith & Wesson was recovered, the agents interviewed Harvey a second time. The interview was secretly recorded, and Harvey changed his story again. This time, Harvey claimed that the guns were taken from him without his knowledge while he was staying at the home of Suki's mother, and that Suki actually sold the guns rather than "tossed" them. Harvey stated that Suki and Perkins were like "brothers" to him, admitted recognizing Mitchell as one of "Suki's boys," and identified Mitchell as the person to whom Suki had sold the Intratec and one of the Taurus pistols.

Harvey was indicted on two counts of making a false statement in connection with the purchase of a firearm: one for the Smith & Wesson purchase, and one for the August purchases at Costello's. After a dispute over whether the recording of the second interview would be played for the jury, the district court ruled that three aspects of the recording were not admissible: (1) statements referring to the HiPoint (for which no charges were filed); (2) statements referring to a double homicide involving the Smith & Wesson; and (3) Harvey's exculpatory statements in which he claimed that Suki had taken the guns without his knowledge. The recorded interview was laced with this inadmissible evidence, and both sides objected to certain portions of the tape. As a compromise, the court excluded the whole tape, but warned that if any part of the recording was introduced by either party, the entire recording would be admitted under the rule of completeness.

At trial, the Government adhered to the court's ruling, but Harvey did not. During cross-examination, defense counsel attacked Agent Miller's credibility regarding what Harvey had told the agents about the Smith & Wesson during their initial encounter in March 2008. The defense pointed to statements made during the second interview to impeach Agent Miller's testimony that Harvey had not disclosed the Smith & Wesson during the March interview. Consistent with its pretrial order, the district court then

admitted almost the entire recorded statement, including the references to the HiPoint, the recovery of the Smith & Wesson, and Harvey's exculpatory statements.

At the close of the evidence, Harvey did not object to the district court's jury instructions, which included an instruction that the Government was not required to present all the evidence it had, and an instruction on the difference between motive and intent. The jury asked several fact-specific questions during deliberations. The district court responded by reading portions of the record to the jury, and also instructed the jurors to focus on their recollection of the evidence as a whole. The jury acquitted Harvey on the first count but convicted him on the second. At sentencing, the court overruled Harvey's objection to a four-level upward adjustment under U.S.S.G. § 2K2.1(b)(6) for transferring a firearm with reason to believe that it would be used in connection with another felony. The district court then sentenced Harvey to 32 months in prison.

## II.

On appeal, Harvey challenges (1) the sufficiency of the evidence supporting his conviction, (2) the district court's admission of the previously excluded evidence, (3) the jury instructions on motive and the amount of evidence required by the Government, (4) the court's response to the jury's questions, and (5) application of the sentencing enhancement. All of Harvey's claims lack merit.

## A.

Harvey's conviction is supported by sufficient evidence. The jury convicted Harvey of making a false statement during the purchase of a firearm in violation of 18 U.S.C. § 922(a)(6). That section provides:

> It shall be unlawful . . . for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or

other disposition of such firearm or ammunition under the provisions of
this chapter.

18 U.S.C. § 922(a)(6).  To sustain a conviction in this case under § 922(a)(6), the
Government had to prove beyond a reasonable doubt that: (1) the defendant knowingly
made (2) a false or fictitious oral or written statement that was (3) material to the
lawfulness of the sale or disposition of a firearm, and was (4) intended to deceive or likely
to deceive a firearms dealer.

Contrary to Harvey's argument, there was sufficient evidence to find that, at the
time he purchased the three weapons on August 7, he knew that his statement on Form
4473—that he was the actual purchaser—was false.  Harvey claims that when he filled
out the ATF form at Costello's, he intended to keep the Taurus for himself, and the idea
of selling the gun to Perkins only occurred to him later.  But a jury could reasonably see
things differently.  Agent Miller and Officer Drexelious testified that Harvey admitted
purchasing the guns at Costello's for Perkins and Suki and taking $340 from Perkins in
exchange for one of the Taurus pistols when they left Costello's.  A jury could infer from
the exchange of money immediately after the purchase, together with Harvey's
admissions to the ATF agents, that Harvey purchased the guns for Perkins and Suki, not
for himself as he told the firearms dealer.  Drawing all inferences in the Government's
favor, *see Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979), the jury's determination that
the false statement was knowingly made was reasonable.

The false statement was also "material to the lawfulness of the sale," 18 U.S.C.
§ 922(a)(6), because, as of August 2007, Perkins and Suki—the true purchasers under the
Government's "straw purchase" theory—were under the age of 21 and could not legally
purchase a handgun.  During the August visit to Costello's, Perkins purchased a rifle and
filled out an ATF form indicating that his birth date was January 1989, making him 18
at the time.  And during his December 2008 interview with the ATF agents, Harvey
admitted that Suki had only just turned 19.  Thus, the Government proved that Perkins
and Suki could not lawfully possess handguns, and Harvey's false statement was

therefore clearly material. We need not decide whether the materiality requirement could have been met without such proof.[1]

Harvey protests that his later, recorded statements—that the guns were stolen while he was staying at the home of Suki's mother—were more credible than his March 2008 confession. The jury, however, had ample reason to discredit the recorded statement as self-serving. First, it was the third version of Harvey's story, after he had previously made inculpatory statements during the initial interview. Second, after being shown a photograph of Perkins, Harvey confessed that he purchased the guns for Perkins and Suki. Third, other portions of the recorded interview—including Harvey's statements that he had seen Suki using two of the weapons while Suki was selling crack cocaine and that Suki and Perkins were like brothers to Harvey—suggested that Harvey had close relationships with people who ended up with his guns, relationships from which the jury could infer a plan to purchase the weapons for Suki and Perkins. Finally, the fatal flaw in Harvey's argument is that even if the jury believed his self-serving statement that Suki stole the Intratec 9 mm and one of the Taurus pistols, that would not explain how a third weapon—the other Taurus—ended up in the hands of Perkins, who was also underage. From all of this evidence, a jury could infer that Harvey's initial confession to the ATF agents, made before he had an opportunity to consult with Suki about what to tell the police, was more credible than his later attempts to shift the blame to Suki.

B.

The trial court did not abuse its discretion by admitting the recorded second interview after defense counsel questioned Agent Miller on what Harvey told the ATF agents about the Smith & Wesson, because the attack on Agent Miller's credibility opened the door to the previously excluded portions of the recording. Before trial, both sides moved to exclude portions of the recorded second interview. The court ultimately ruled that the following were not admissible: (1) evidence that Harvey purchased a HiPoint later recovered in an abandoned building; (2) evidence that the Smith & Wesson

---

[1]Arguably, a purchaser's misrepresentation that he is the actual buyer is *itself* a materially false statement. *See United States v. Hernandez*, 633 F.3d 370, 372 (5th Cir. 2011).

was recovered from the scene of a multiple shooting; and (3) Harvey's recorded exculpatory statements. The court, however, warned counsel that introducing any part of the recorded statement would open the door to the entire recording. Admitting only the exculpatory statements, the court reasoned, would lead jurors to think that the Government was trying to conceal the recorded statement.

The court did not abuse its discretion by admitting the entire recording (including the exculpatory portions) after defense counsel cross-examined Agent Miller about contradictory statements in the recording. Defense counsel all but invited the court to admit the evidence. "Generally, evidence which is otherwise suppressed or excluded becomes admissible when the defendant opens the door to the issue." *United States v. Crawford*, 86 F. App'x 834, 838 (6th Cir. 2004). "If the defendant uses otherwise excluded evidence, the district court does not abuse its discretion by allowing the prosecution to use the inculpatory aspects of the excluded material to 'clear up' any false impressions created by the defense." *Id.* (quoting *United States v. Spikes*, 158 F.3d 913, 929 (6th Cir. 1998)). The district court repeatedly warned counsel that cross-examining the Government witnesses about Harvey's recorded statements would result in the admission of the entire recording, which included the circumstances of how Cincinnati police recovered the HiPoint and the Smith & Wesson.

Despite these warnings, defense counsel persisted in asking Agent Miller about discrepancies between his account of the initial interview—that Harvey had failed to mention anything about a Smith & Wesson—and the agents' subsequent confusion in the second interview about which guns Harvey had told them about. The court then permitted the Government to rehabilitate Agent Miller by introducing the context of the recorded statement, which showed that the agents did not know Harvey had purchased a Smith & Wesson until after it was recovered from a shooting, and that the Smith & Wesson was not recovered until after the initial interview in March 2008. The timing and circumstances surrounding the recovery of the Smith & Wesson explained the ATF agents' confusion about the weapons in the second interview and rebutted the defense's

implication that Agent Miller had consciously misrepresented Harvey's disclosure about the Smith & Wesson in the first interview.

Even if the district court might have imposed a less drastic remedy, it is not clear how Harvey was prejudiced by the admission of the entire recorded statement. The jury acquitted Harvey of the § 922(a)(6) charge related to the purchase of the Smith & Wesson. There is little reason to think that statements about the recovery of the Smith & Wesson, and how it was involved in a shooting, led the jury to convict Harvey for his false statement related to the multiple purchases at Costello's while acquitting him of the charge related to the purchase of the Smith & Wesson. And the circumstances surrounding the recovery of the HiPoint—it was found in an abandoned building and did not result in any charges under § 922(a)(6)—were not such that the prejudice resulting from the statement referring to the HiPoint "substantially outweighed" the probative value of the entire recording. *See* Fed. R. Evid. 403.

A district court enjoys "very broad discretion" in determining whether the prejudicial danger of evidence substantially outweighs its probative value. *United States v. Guthrie*, 557 F.3d 243, 251 (6th Cir. 2008). Even if it was slightly cumulative of the ATF agents' testimony, the audio recording of the second interview was highly probative of the charged § 922(a)(6) offenses and included exculpatory statements that defense counsel wanted admitted in the first place. For all of these reasons, the district court did not abuse its discretion in admitting the previously excluded evidence.

## C.

The district court also properly instructed the jury. Because Harvey did not object to the jury instructions at trial, review is for plain error. *See United States v. Vasquez*, 560 F.3d 461, 470 (6th Cir. 2009). Harvey argues that the court erred in two of its instructions to the jury, first on the Government's burden of proof, and second on the difference between motive and intent. Neither instruction was improper, much less plain error.

On the Government's burden of proof, the court stated:

> Although the government is required to prove the defendant guilty beyond a reasonable doubt, the government is not required to present all possible evidence related to the case or to produce all possible witnesses who may have some knowledge about the facts of the case.

This instruction—drawn directly from the Third Circuit's Model Jury Instruction 3.05—was a correct statement of the law. *See United States v. Balark*, 412 F. App'x 810, 818 (6th Cir. 2011). The Government requested this instruction because it perceived itself as "hamstrung" by the district court's evidentiary rulings and was anxious to avoid misleading the jury into thinking the prosecutor had intentionally concealed Harvey's recorded statement. Thus, the instruction was proper because it cured any impression that the Government was attempting to hide evidence.

A jury instruction that accurately reflects the governing law is not reversible error unless the instruction is "confusing, misleading, or prejudicial." *Guthrie*, 557 F.3d at 252 (internal quotation marks omitted). Contrary to Harvey's suggestion, the instruction did not imply that the Government had other evidence it chose not to bring in this case. Even if it did, that implication did not prejudice Harvey because elsewhere the court instructed the jurors that they "must make [their] decision based only on the evidence that you saw and heard here in court." The court repeated this instruction a second time, and also told the jury that basing the verdict on anything but the evidence presented at trial would violate their duty as jurors. Jurors are presumed to follow instructions, *United States v. Neuhausser*, 241 F.3d 460, 469 (6th Cir. 2001), and Harvey offers nothing to rebut the presumption that the jury followed this instruction in reaching its guilty verdict. In any event, the instruction was certainly not plain error.

As to motive and intent, the court instructed the jury:

> Intent and motive are different concepts and should never be confused. Motive is what prompts a person to act or fail to act. Proof of motive does not establish guilt, nor does want of proof of motive establish that the defendant is innocent. Intent refers only to the state of mind with which the act is done or omitted.

It is not clear from the record why the Government requested this instruction, or why the district court agreed to it. Instructions on motive are often used to underscore its immateriality to proof of the defendant's guilt, but it is not clear how the distinction aided the Government in this case. If anything, the distinction helped Harvey by eliminating a category of evidence the jury might otherwise have used—mistakenly—to convict him. Indeed, defense counsel explicitly agreed to this instruction. In any event, the instruction accurately states the difference between motive and intent, and there is nothing misleading about pointing this out in a criminal trial for an offense that requires proof of one but not the other.

Harvey can point to no way in which he was prejudiced by making the distinction explicit. Instead, the instruction, far from being misleading, clarified what was necessary and sufficient for the jury to convict him. The court also instructed the jury on the elements of the offense and the required mental state—that Harvey knew the statement was false. Even if the distinction between motive and intent had the potential to create some confusion, the instruction was certainly not plain error.

D.

Harvey also challenges the district court's response to the jury's factual questions during deliberations. The court summarized the questions from the jury as follows:

> [The jurors] want to hear the tape recording again, they want to have the dates that the guns were confiscated, and Officer Drexelius—they said they wanted officer D's testimony about Agent Miller and first interview, whether notes were taken and when money was exchanged.

The court responded to the jury's questions by reading back discrete portions of the record. But before the court did so, it gave the following cautionary instruction:

> Another part of your job as jurors is to decide how credible and believable each witness was. This is your job and not mine. It's up to you to decide if a witness's testimony was believable and how much weight you think it deserves.

> You are free to believe everything a witness said or only part of it or none of it at all, but you should act reasonably and carefully in making these decisions.

> Your collective recollection of a particular witnesses's testimony controls. You should follow the instructions as previously given to you with regard to weighing and evaluating all the evidence. Just because the Court is responding to these particular questions with these particular pieces of testimony does not mean that you should give it any more or less weight than you believe it deserves.

The court then read portions of the testimony back to the jurors in response to their questions. The court read Officer David Gregory's testimony that he recovered the Intratec 9 mm in December 2007, Detective Bemmes' testimony that he recovered the Smith & Wesson on July 10, 2008, and Officer Jason Rees' testimony that he recovered the Taurus on August 24, 2007. The court then read Officer Drexelius' testimony about whether notes were taken during the agents' interview with Harvey, and lastly read Agent Miller's testimony that Harvey told him Perkins gave him $340 for the Taurus "when they left" Costello's.

The district court's response was not an abuse of discretion. The court did not paraphrase the record or inject its own view of the testimony into its response. The court conferred with the parties as to whether the selected portions of the record were responsive to the jury's questions, and was careful to provide enough testimony to place the responsive portions in context. Defense counsel agreed that the selected testimony was responsive, and conceded that the dates the guns were recovered and whether the agents took notes were not disputed. As to the timing of the exchange of $340 for the Taurus, the court's cautionary instruction mitigated any indication that the jurors should place more weight on Agent Miller's testimony merely because the court read it back to them. The jurors presumably followed this instruction. *See Neuhausser*, 241 F.3d at 469. Because the court read only those portions of the record responsive to the questions and refocused the jury on its recollection of the evidence as a whole, there was no abuse of discretion. *See United States v. Davis*, 490 F.3d 541, 548 (6th Cir. 2007).

We caution that reading testimony to a jury during its deliberations is not always the better response when the jury's questions are factual rather than legal in nature. We have previously identified two "inherent dangers" in this practice: first, that the jury may give undue emphasis to such testimony, and second, that the testimony may be taken out of context. *United States v. Padin*, 787 F.2d 1071, 1076 (6th Cir. 1986). These concerns are most acute where the trial judge's response risks usurping the jury's factfinding role as to the subject matter of the question, such as where the question is phrased in very general terms, involves disputed facts, or is obviously related to a credibility determination. And "these concerns are escalated after the jury ha[s] reported its inability to arrive at a verdict." *Id.* at 1077 (citing *Henry v. United States*, 204 F.2d 817 (6th Cir. 1953)). In these situations, it will often be preferable to respond by instructing the jury to rely on its collective recollection of the testimony. Such a response "carefully preserve[s] the province of the jury while minimizing any prejudice to the defense or the prosecution." *United States v. McClendon*, 362 F. App'x 475, 483 (6th Cir. 2010) (internal quotation marks omitted).

But in other situations, like this one, reading portions of the record is an appropriate exercise of the trial court's discretion. The "inherent dangers" are minimized where the jury's factual questions are very specific and definitive answers can be easily located in the record, such as questions about specific dates and times where such facts are not disputed. In these situations, reading testimony to the jury facilitates rather than usurps the jury's factfinding role, and does no more to emphasize a particular piece of testimony than the jury has already done in framing the question. And the dangers are further minimized where, as here, the trial court takes precautionary measures to preserve the context of the testimony and lessen the risk of undue emphasis, such as involving the parties in crafting a response and issuing a supplemental instruction that urges the jury to rely primarily on its collective memory. Thus, under the circumstances here presented, there was no abuse of discretion.

E.

Finally, the sentencing enhancement was proper. The presentence report recommended a four-level enhancement because Harvey had reason to believe a firearm would be used in connection with another felony offense. *See* U.S.S.G. § 2K2.1(b)(6). The relevant guideline provides:

> If the defendant used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense, increase by 4 levels.

*Id.* The district court agreed with the recommendation, finding that "[Harvey] knew the individuals with whom he was dealing and knew that the firearms would be used by those who were engaged in drug trafficking."

That finding is not clearly erroneous. The nature of Harvey's relationship with Perkins and Suki, together with the trial testimony, support the district court's inference that Harvey transferred a firearm with "reason to believe" that it would be used or possessed in connection with drug trafficking. The district court found that by Harvey's own admissions, Perkins and Suki were like brothers to him. Harvey also admitted that he saw Suki with the guns while Suki was selling crack cocaine, that he knew Suki had sold two of the guns to Mitchell (another drug trafficker who ended up with guns Harvey had purchased), and that Mitchell was one of "Suki's boys." From this evidence, the court could infer that Harvey had "reason to believe" his guns would be used "in connection with" another felony offense—i.e., drug trafficking. *See* U.S.S.G. § 2K2.1(b)(6).

To be sure, the fact that Harvey saw Suki using the guns while selling crack cocaine—sometime after the transfer—does not by itself establish that, at the time of the transfer, Harvey had "reason to believe" the guns would be used in drug trafficking. But the use of a firearm during a drug deal is certainly a foreseeable result of transferring that firearm to a known drug dealer. And it is not unreasonable to infer that, if someone is like

a brother to you, you will be aware that he engages in drug trafficking. In affirming a § 2K2.1(b)(6) enhancement in a similar case, the Seventh Circuit held that the defendant had reason to believe the firearm would be used in a felony because the transferee "was a convicted felon, and had done drugs with [the defendant] and committed acts of violence in his presence." *United States v. Mahalik*, 498 F.3d 475, 480 (7th Cir. 2007). The Third Circuit drew a similar inference from the defendant's knowledge that the transferee was a drug dealer. *United States v. Dupree*, 388 F. App'x 164, 168 (3d Cir. 2010). Here, although an inference is required to find that Harvey had "reason to believe" Suki and Mitchell planned to use the guns in drug trafficking at the time Harvey purchased them, that is a fair inference from the record.

The required nexus between the transfer of the firearm and an independent felony offense was established by testimony that at least one of the guns had been "used" in drug trafficking. The guideline does not require the independent felony to be committed by the defendant. *United States v. Richardson*, 510 F.3d 622, 629 (6th Cir. 2007) (McKeague, J., concurring). Instead, the enhancement applies on its face if Harvey had reason to believe that the firearm would be used "in connection with" another felony, regardless of who committed that felony. The application notes to the guideline support this point. The enhancement applies "if the firearm . . . facilitated, *or had the potential of facilitating*, another felony offense." U.S.S.G. § 2K2.1(b)(6), cmt. 14(A) (emphasis added). The district court's finding that Harvey "knew that the firearms would be used by those who were engaged in drug trafficking," though brief, amounts to a finding that the guns at least "had the potential of facilitating" another felony offense. *Id.*

### III.

The judgment of the district court is affirmed.