NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0364n.06

Case Nos. 23-5762/5819

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| Plaintiff-Appellee, | ) | Jul 23, 2025 |
|  | ) | KELLY L. STEPHENS, Clerk |
| v. | ) |  |
|  | ) | ON APPEAL FROM THE |
| RUVI BEANEY PACHECO (23-5762); | ) | UNITED STATES DISTRICT |
| CLAUDIO EVERARDO CABRERA, JR. (23- | ) | COURT FOR THE EASTERN |
| 5819), | ) | DISTRICT OF KENTUCKY |
| Defendants-Appellants. | ) | O P I N I O N |
|  | ) |  |

Before: BOGGS, McKEAGUE, and MATHIS, Circuit Judges.

BOGGS, Circuit Judge. In this conspiracy case, romantic partners Ruvi Beaney Pacheco and Claudio Everardo Cabrera, Jr. ("Appellants"), were convicted of money laundering and conspiracy to commit money laundering. They were sentenced to 110 months in prison. In this consolidated appeal, we are faced with four arguments: one alleging error in a supplemental jury instruction at trial, and three alleging procedural unreasonableness at sentencing. We reject all four arguments and affirm.

I

Lexington, Kentucky, was the center of a global drug-trafficking conspiracy that ran from December 2020 to August 2024. Appellants, though not charged with participating in the drug trafficking, were among various individuals charged with participating in the connected money-laundering conspiracy, which ran from about December 2020 to about August 2022.

Appellants were also charged with having engaged in an unlawful financial transaction intended to promote drug trafficking. This appeal concerns the criminal activity underlying and highlighted by events in Lexington on three dates — December 7, 2020; December 20, 2020; and February 1, 2021 — though Appellants also likely laundered money in various other states, including Michigan, California, North Carolina, Texas, Florida, Georgia, Pennsylvania, Connecticut, Ohio, and Arizona.

A

First, a primer on Appellants' usual game plan. Pacheco and Cabrera would purchase expensive one-way tickets — either the day before or the day of flights — to a wide array of cities where they participated in "money pickups" arranged by various drug-trafficking brokers. For example, Cabrera admitted that on one occasion "he was instructed to travel to Kentucky, pickup the money, and return it to Los Angeles, California, in exchange for payment." When they pursued this enterprise in Lexington, Appellants always stayed at the same hotel: the Marriott TownePlace Suites Lexington Keeneland/Airport. And though Demarkus Nemetz — one of the conspirators charged with the underlying drug-trafficking crime — was the only person that Appellants ever met with while in Lexington, Appellants always told the hotel that they were in town to visit family and provided at check-in the same home address: 13014 Sweetspice Street, Moreno Valley, CA 92553. Appellants never left the hotel, except for one time when they Ubered to a restaurant to pick up a pizza; Nemetz always delivered drug proceeds to them in their hotel room. According to flight records and the testimony of a DEA agent, Appellants then "flew out the next morning" after they collected the money and received "the next phone call or the next contract to find out what city they would go to after that to pick up more bulk currency." There was a third player in the enterprise: Pacheco's brother Giovanni, who — just like Appellants — stayed at the Marriott

2

TownePlace Suites Lexington Keeneland/Airport, received drug-fund deliveries from Nemetz in his hotel room, told the hotel that he was just in town to visit family and that his home address was 13014 Sweetspice Street, and flew out the next morning.

Three instances and ascertained quantities of money laundering are our focus today.

On December 7, 2020, Nemetz delivered $80,000 to Pacheco's brother, who was in his room at the Marriott TownePlace Suites. The $80,000 was part of a $180,000 delivery that a DEA agent (undercover as a courier) had arranged to participate in. That agent had already received most of the other $100,000, and a DEA investigation suggested that the remainder was delivered to Pacheco's brother. Though Pacheco argues that "there was and is no evidence that Pacheco and her brother ever traveled together," trial evidence showed that Pacheco's brother exactly followed Appellants' usual plan in Lexington, even providing the same home address as Appellants' to the hotel at registration. The money was concealed in a red Nike shoebox, a federal agent testified that it was common to find drug proceeds concealed in shoeboxes for transfer or storage, and Nemetz was no longer holding the shoebox when he left Pacheco's brother's hotel room.

On December 20, 2020, Nemetz delivered a bag to Cabrera in Cabrera's Marriott TownePlace Suites room. In his testimony, DEA agent Elijah Morris estimated "[b]ased upon the money pickups that [the DEA] had done with Mr. Nemetz prior to and what's been after" that the amount in that bag was "nothing lower than 50,000" but "estimate[d] . . . between 100,000 to $200,000." The district court determined that Morris's testimony and "other information in the case" showed that, "typically, the amounts that were being picked up and delivered were in the range of $100,000 at a lower number and in most cases higher than that." Accordingly, the district court made a "reasonable calculation based upon all the evidence" that "the conservative number of $100,000" was appropriate for sentencing purposes.

On February 1, 2021, Appellants flew into Lexington, Kentucky, from different locations. They checked into the Marriott TownePlace Suites together, and later that evening Nemetz was followed by federal agents to the hotel. Nemetz was seen entering the hotel while carrying an orange Nike bag. Video footage from inside the hotel showed him entering the room occupied by Appellants while carrying the bag before exiting a minute later without it. The emptied bag was recovered from the hotel room's trash can the next day. Appellants were stopped the next morning at the Lexington airport by law-enforcement agents whose drug dog alerted to the odor of narcotics in Appellants' luggage. Appellants consented to a search that uncovered $196,870 but no drugs. At the airport, Pacheco said that they had come to visit family, had stayed in a hotel, and were flying back out. But she declined to make any other statement. Cabrera, however, gave agents his phone and stated that he had come to Kentucky at the direction of an uncle to pick up an unknown amount of money for the uncle from a "black male" in Lexington. Cabrera told agents that he had met this man at a Subway in Lexington and received a black backpack with currency in it. Testimony at trial revealed that Nemetz was this man.

However, there was no evidence that Cabrera ever met anyone at a Subway, and no black backpack was ever found in Appellants' hotel room. Cabrera also stated that Appellants had "flown in from Los Angeles to pick up money." Ultimately, Cabrera's statement did not inculpate Pacheco, and there was no evidence of texts to or from Pacheco. It was later confirmed at trial that the government had no information concerning what anyone may have told Pacheco regarding the origin of the money.

B

A few hours into jury deliberations at trial, the jury sent the judge this question: "Was there a drug dog/K-9 unit utilized in the airport search of Cabrera and Pacheco's luggage, in relation to

[Task Force Officer ("TFO")] Hart's testimony, on February 2, 2021?" Through their counsel, all parties agreed that, though "the answer" was that "there was testimony that [an officer's drug dog] alerted to the luggage," the appropriate response was that the jury "ha[d] to refer to their memories, their notes of the testimony. . . . [T]he Court can [not] specifically answer the question."

The trial judge disagreed. In his view, there was no problem with the jury "ask[ing] to have a portion of the transcript read" because there was no "dispute about the testimony on this issue." He first asked if the "parties dispute that . . . the testimony of Officer Hart" confirmed that a drug dog was used in the airport search. All parties agreed that "[t]hat was [Hart's] testimony, that a drug dog was present," and the trial judge then instructed the security officer to deliver to the jury the following response: "Members of the jury, in response to your question, testimony was presented by TFO Officer Hart that a drug dog/K-9 unit was used in the airport search of Defendants Cabrera's and Pacheco's luggage on February 2nd, 2021." When the jury was brought in, 24 minutes later, the trial judge gave the following as a "further cautionary instruction": "[P]lease keep in mind that you should consider the testimony on the issue that you raised together with all the other testimony and evidence presented in the case. Do not consider it by itself, out of context. Consider all the evidence together as a whole."

C

In the presentence report, the probation officer calculated Appellants' total offense level to be 34. The base offense level was 24: 8 per Guidelines § 2S1.1(a)(2) plus 16 per Guidelines § 2B1.1(b)(1)(I) because "the defendant laundered more than $1,500,000." The officer also applied two increases for specific offense characteristics: (1) six points per Guidelines § 2S1.1(b)(1) because Appellants knew or believed that any of the laundered funds were the "proceeds of, or were intended to promote . . . an offense involving the manufacture, importation,

or distribution of a controlled substance," and (2) four points per Guidelines § 2S1.1(b)(2)(C) because Appellants were "in the business of laundering funds." Both Appellants objected, claiming that the only amount attributable to them was $196,870 — seized from them in Lexington on February 2, 2021 — and that they had not been in the business of laundering funds.

The district court sustained the objection in part. It first determined that the amount attributable to Pacheco was $276,870 — the $196,870 seized on February 2, 2021, plus the $80,000 that Nemetz delivered to Pacheco's brother on December 7, 2020. The court reasoned that trial testimony had shown extensive contact and coordination between Pacheco, Cabrera, and Pacheco's brother, and thus that the $80,000 delivery was attributable to Pacheco because it was a reasonably foreseeable part of the overall crime. The district court then determined that the amount attributable to Cabrera was $376,870 — the $196,870 seized on February 2, 2021, plus the $80,000 that Nemetz delivered to Pacheco's brother on December 7, 2020, plus the $100,000 that Nemetz delivered to Cabrera on December 20, 2020. Regarding the latter, the court reasoned that trial testimony had shown that $100,000 was a conservative estimate of the amounts that were usually picked up and delivered in transactions during the course of the conspiracy.

Next, the district court squarely rejected the objection to the four-level enhancement per Guidelines § 2S1.1(b)(2)(C) for being in the business of laundering funds, emphasizing that Appellants were "operating in the way in which money launderers operate, and . . . caught . . . engaging in money laundering activities." The court emphasized that Appellants satisfied the factors required under § 2S1.1(b)(2)(C) because it appeared from the evidence that they "regularly engaged in laundering of funds," "engaged for an extended period of time," and laundered money "from multiple sources." The district court emphasized that the money laundering in this case was

not only repeated, but was also Appellants' nearly exclusive source of income (though there was no direct evidence of their income from their crimes).

Ultimately, Appellants were each convicted of conspiring to commit money laundering and committing promotional money laundering. Pacheco was held responsible for laundering $276,870 of drug proceeds. Cabrera was held responsible for laundering $376,870 of drug proceeds. This adjusted Appellants' offense levels down from the presentence report's 34 to a final 30: (1) a reduced base offense level of 20 (8 per Guidelines § 2S1.1(a)(2) plus 12 per Guidelines § 2B1.1(b)(1)(G) for loss more than $250,000, rather than the presentence report's 16 per § 2B1.1(b)(1)(I) for loss more than $1,500,000), (2) the unappealed six-point increase per § 2S1.1(b)(1) for connection to drug trafficking, and (3) the sustained four-point increase per § 2S1.1(b)(2)(C) for being in the business of money laundering. Because both Appellants had no criminal-history points, their guideline range was 97 to 121 months; both were ultimately sentenced to 110 months of imprisonment and timely appealed.

II

First, Appellants argue that the district court erred in answering the jury's factual question about the drug-dog testimony. We reject this argument.

We review a judge's decision to give a supplemental instruction for abuse of discretion. *United States v. Giacalone*, 588 F.2d 1158, 1166 (6th Cir. 1978). Though review is for plain error if Appellants "[did] not object to the jury instructions at trial," *United States v. Harvey*, 653 F.3d 388, 395 (6th Cir. 2011), we decline to address the parties' disagreement on the applicability of plain error — Appellants already fail under the abuse-of-discretion standard, which is more lenient.

"[A] district court's response to the jury's factual questions during deliberations [is] . . . . not an abuse of discretion" if it "read[s] only those portions of the record responsive to the

questions and refocus[s] the jury on its recollection of the evidence as a whole." *Id.* at 396–97. *Harvey* involved a defendant who was convicted of making a false statement during the purchase of firearms. *Id.* at 391. During jury deliberations, the jurors wanted to hear again a recording of a law-enforcement interview of the defendant, to have "the dates that the purchased guns were confiscated," and to hear again the testimony about the interview and "whether notes were taken and when money was exchanged." *Id.* at 397. The district court read back discrete and responsive portions of trial testimony with the "cautionary instruction" that "[j]ust because the Court is responding to these particular questions with these particular pieces of testimony does not mean that you should give it any more or less weight than you believe it deserves." *Ibid.*

We held in *Harvey* that the district court's response was not an abuse of discretion. "[T]he court read only those portions of the record responsive to the questions and refocused the jury on its recollection of the evidence as a whole." *Ibid.* Instead of "paraphras[ing] the record or inject[ing] its own view of the testimony into its response[, t]he court conferred with the parties as to whether the selected portions of the record were responsive to the jury's question." *Ibid.* And "the court's cautionary instruction mitigated any indication that the jurors should place more weight on [the particular] testimony merely because the court read it back to them." *Ibid.*

For the same reasons, there was no abuse of discretion here. Though the trial judge did not literally read the specifically responsive testimony back to the jurors, he accomplished the same confirmatory effect while leaving no room for inappropriate juror reliance on the supplemental instruction. All he did was recognize the fact that certain testimony had confirmed the use of a drug dog in the airport search: "Members of the jury, in response to your question, testimony was presented by . . . TFO Officer Hart that a drug dog/K-9 unit was used in the airport search of Defendants Cabrera's and Pacheco's luggage on February 2nd, 2021." There was no paraphrasing

the record or injecting his own view of the testimony. He conferred with the parties to confirm that this testimony was responsive to the jury's question. And he ultimately gave the jury a detailed cautionary instruction emphasizing that the jury was to consider its collective knowledge of the evidence as a whole: "[I]n response to your earlier question and my response, please keep in mind that you should consider the testimony on the issue that you raised together with all other testimony and evidence presented in the case. Do not consider it by itself, out of context. Consider all the evidence together as a whole."

Our circuit recognizes "two inherent dangers" with "reading testimony to a jury during its deliberations": "first, that the jury may give undue emphasis to such testimony, and second, that the testimony may be taken out of context." *Ibid.* (citation modified). However, these dangers "are minimized where the jury's factual questions are very specific and definitive answers can be easily located in the record." *Id.* at 398. "And the dangers are further minimized where, as here, the trial court takes precautionary measures to preserve the context of the testimony and lessen the risk of undue emphasis, such as involving the parties in crafting a response and issuing a supplemental instruction that urges the jury to rely primarily on its collective memory." *Ibid.*

Thus, the dangers here were greatly minimized based on our precedent. There was no abuse of discretion in the district court's supplemental jury instruction, which was a specific verification from the record of the use of a particular dog on a particular date and accompanied by a precautionary instruction reminding the jury to focus on its collective knowledge.

III

Next, Appellants challenge their sentences as procedurally unreasonable on two grounds: the amount of loss attributable to them and the enhancement for being in the business of money

9

laundering. Cabrera separately challenges his sentence as procedurally unreasonable on yet a third ground: the lack of a reduction for being a minor participant. We reject all three arguments.

"Sentencing challenges are reviewed for abuse of discretion." *United States v. Coppenger*, 775 F.3d 799, 802 (6th Cir. 2015). A court has abused discretion by imposing a procedurally unreasonable sentence if the court "failed to calculate the Guidelines range properly; treated the Guidelines as mandatory; failed to consider the factors prescribed at 18 U.S.C. § 3553(a); based the sentence on clearly erroneous facts; or failed to adequately explain the sentence." *Id.* at 803. "In evaluating the procedural reasonableness of a defendant's sentence, we review a district court's findings of fact for clear error and its legal conclusions *de novo*." *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018) (citation modified).

A

The district court correctly calculated the money-laundering funds attributable to Appellants and the appropriate sentencing ranges. Appellants argue that their sentences were procedurally unreasonable because the sentences were based on clearly erroneous facts. Appellants also argue that, "as a result," the district court incorrectly calculated the ranges.

"In determining the amount of loss attributable to a defendant pursuant to Guidelines § 2B1.1(b), the district court may consider any 'relevant conduct.'" *Id.* at 894 (quoting USSG § 1B1.3(a) (2021)). Where, as here, there is "jointly undertaken criminal activity[,] . . . . the amount of loss attributable to a defendant may include any loss that resulted from his/her own conduct, as well as any loss that resulted from certain conduct of others." *Ibid.* (citation modified). "Conduct of others that . . . is within the scope of, in furtherance of, and reasonably foreseeable in connection with jointly undertaken criminal activity . . . is relevant conduct . . . for which a defendant may be held accountable." *Ibid.* (citation modified).

We affirm the district court's decision on the attributed loss as a matter of both law and fact. We review both aspects of the decision because the ambiguity of Appellants' "as a result" language renders unclear whether they are appealing the district court's legal conclusions or just noting alleged legal errors as the de facto effect of alleged factual errors. This ambiguity is worsened by the juxtaposition of Appellants' singular focus on clear error (which is applied to findings of fact) as the standard of review and their sudden invoking of alleged legal errors.

On both the law and the facts, the $80,000 delivered on December 7, 2020, by Nemetz to Pacheco's brother was correctly attributed to Appellants. And on both the law and the facts, the $100,000 estimated to have been delivered on December 20, 2020, by Nemetz to Cabrera was correctly attributed to Cabrera. Appellants do not contest the district court's consideration of the $196,870 that law enforcement seized from Appellants on February 2, 2021.

1

There was no error in the court's legal conclusions about the loss attributable to Appellants.

First, under our de novo analysis of "relevant conduct," we include all criminal acts and omissions of the defendant. *Ibid.* Because the December 20, 2020, delivery from Nemetz to Cabrera was attributed to Cabrera, the inclusion of this delivery as a matter of law in the loss attributable to Cabrera was clearly correct.

But in the case of jointly undertaken criminal activity, we also add all other conduct that is (1) within the scope of, (2) in furtherance of, and (3) reasonably foreseeable in connection with, that jointly undertaken criminal activity. *Ibid.* This analysis has two steps. First, we "determine the scope of the criminal activity the particular defendant agreed to jointly undertake." *Ibid.* (quoting USSG § 1B1.3 cmt. n.3(B)). This step is limited to "the scope of the specific conduct and objectives embraced by the defendant's agreement," but "any explicit agreement [and any]

implicit agreement fairly inferred from the conduct of the defendant and others may be considered." *Id.* at 895 (citation modified). We look to: "(1) the existence of a single scheme; (2) similarities in modus operandi; (3) coordination of activities among schemers; (4) pooling of resources or profits; (5) knowledge of the scope of the scheme; and (6) length and degree of the defendant's participation in the scheme." *Ibid.* (quoting and adopting *United States v. Salem*, 657 F.3d 560, 564 (7th Cir. 2011)). Second, we "determine if the conduct of others at issue was 'in furtherance' of that activity and 'reasonably foreseeable' in connection with that activity." *Ibid.*

a

Step One is satisfied here. The December 7, 2020, delivery was within the scope of the criminal activity that Appellants agreed to jointly undertake.

In *Donadeo*, the defendant was part of a mail-fraud and money-laundering conspiracy that relied on one of its members, a school district's IT director, to funnel the school district's money via fake invoices to five shell corporations. *Id.* at 890. Two of these shell corporations were established and owned by a conspiracy member named Palazzo, the third was established and owned by a conspiracy member named Boyles, the fourth was established and owned by the defendant, and the fifth was jointly established and owned by Palazzo and the defendant. *Ibid.*

We held, based on the six factors, that "the scope of [the defendant's] jointly undertaken criminal activity was broad enough to include the conduct of" Palazzo and Boyles. *Id.* at 896. First, "[t]he scheme to defraud the [school district] had a single, unlawful objective — to obtain as much money from the [school district] as possible." *Ibid.* (attributing conduct of both Palazzo and Boyles). Second, "[t]he group . . . all defrauded the [school district] in the exact same manner — by establishing and owning shell corporations that purported to provide IT-related goods and services." *Ibid.* (attributing conduct of both Palazzo and Boyles). Third, "[t]he scheme . . .

12

required at least some coordination among all of the co-conspirators" and "[a]ll of the individuals involved coordinated with . . . Palazzo." *Id.* at 897 (attributing conduct of Palazzo). Fourth, there was pooling of resources or profits because Palazzo used his money to open the corporate bank account for the shell corporation that he jointly established and owned with the defendant, and Palazzo and the defendant both deposited checks into and generally used that account. *Ibid.* (attributing conduct of Palazzo). Fifth, the defendant "knew at the time he joined in the scheme to defraud the [school district] that . . . Palazzo had established and owned at least one other shell corporation that he was using for that purpose." *Id.* at 898 (attributing conduct of Palazzo). Sixth, while the defendant was "not the architect of the scheme[,] . . . he participated for over two years during which he established and owned two shell corporations that were responsible for almost one-third of the total loss that resulted from the entire four-year conspiracy." *Ibid.* (attributing conduct of both Palazzo and Boyles).

Here, Nemetz's delivery to Pacheco's brother satisfied nearly all these factors. The entire scheme here had the single, unlawful objective of laundering the funds from the underlying drug-trafficking conspiracy. The modus operandi of the delivery to Pacheco's brother was exactly like that of the deliveries to Appellants, and, without coordination of activities between Appellants and Pacheco's brother, the similarity of the modus operandi is too strong to be coincidental.

All the deliveries at issue in this case happened at the same Marriott TownePlace Suites. Money couriers tend to locate near the airport, and this hotel is "one of the closest hotels to the [Lexington] airport." Pacheco argues that "there was and is no evidence that Pacheco and her brother ever traveled together." But trial evidence confirmed that Pacheco's brother, just like Appellants, checked into the Marriott TownePlace Suites, provided 13014 Sweetspice Street as his home address, said that he was just in town to visit family, received the drug funds from Nemetz

in his hotel room, and flew out the next morning. Like the district court, we see "evidence of a short visit earlier by a person or relative living at the same address in California, traveling in the same manner, staying at the same hotel, and using the same excuse." "The closeness in time would certainly indicate that [Pacheco] would have known of [her brother's] activities, especially if she was in this business of laundering funds." And given that Pacheco and Cabrera were partners in both romance and crime throughout this entire operation, the December 7 delivery was correctly attributed to Cabrera. Indeed, Morris confirmed that an "intel analyst" conducted a "toll analysis" showing that Cabrera and Pacheco's brother had messaged each other "back and forth" on their phones. All the evidence shows that both Appellants were extensively and knowledgeably involved in this scheme, of which Nemetz's delivery to Pacheco's brother was just one small and identical part.

b

Step Two is also satisfied here: the December 7, 2020, delivery was in furtherance of and reasonably foreseeable in connection with Appellants' jointly undertaken criminal activity. Because the delivery was money laundering, it was clearly in furtherance of the jointly undertaken criminal activity. For the reasons that follow, the delivery was also reasonably foreseeable.

In *Donadeo*, we held that, because the defendant had "jointly established and owned" a shell corporation with Palazzo, "it was reasonably foreseeable that" Palazzo had other shell corporations that "he was similarly using to defraud the [school district]." *Id.* at 899. We then held that, as to Boyles's shell corporation, because the defendant was recruited to join in the scheme by Palazzo, "it was reasonably foreseeable that . . . Palazzo had recruited or would in the future recruit others . . . to do the same." *Ibid.*

14

Here, too, Appellants had worked with Nemetz, receiving deliveries from him in the exact same Marriott TownePlace Suites when they were in Lexington. Even if we were to close our eyes to the obvious fact that Pacheco's brother was following Appellants' exact Lexington-laundering playbook — even giving the exact same home address that Appellants did — and even suppose that Nemetz's delivery had been to a stranger, it was reasonably foreseeable that Nemetz was a central conspiratorial figure who was going to carry out such similar deliveries.

The district court thus properly found as a matter of law that the December 7 delivery was attributable to Appellants and that the December 20 delivery was attributable to Cabrera.

2

Next, the district court made no clear error in its factual findings regarding the loss attributable to Appellants. "[T]he underlying factual findings regarding whether [particular] conduct is 'within the scope' of, 'in furtherance' of, and 'reasonably foreseeable' in connection with jointly undertaken criminal activity are reviewed for clear error." *Id.* at 893 (quoting USSG § 1B1.3(a)(1)(B)). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Ibid.* (citation modified).

First, we conclude that the factual findings regarding the December 20, 2020, delivery pass muster under clear-error review. Cabrera argues that, though he appeared in Lexington on that day, he "was never stopped at the airport when he flew out . . . and there was no evidence of any amount of money or money transaction." He also argues that DEA Agent Morris "speculate[d] and estimate[d]" that Cabrera transported $100,000 because "no money was actually seized."

But Cabrera conveniently ignores the part of Morris's testimony that the district court relied on: the DEA had "surveillance video from inside the hotel . . . show[ing] . . . Nemetz entering the

15

hotel with a gift bag, going to . . . Cabrera's room, staying for a very short time" before leaving emptyhanded. This video footage — combined with Morris's other testimony and other information in the case that showed that the Nemetz money pickups ranged from $50,000 to $200,000 but "typically . . . were in the range of $100,000 at a lower number and in most cases higher than that" — was why the district court made the reasonable estimate of $100,000 based on the facts that it had before it. A reasonable estimate is all that is needed, not mathematical proof. USSG § 2B1.1 cmt. 3(C) ("The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence.").

And, in any event, given that we hold in this case that the $276,870 apart from this delivery was properly attributed to Cabrera, Cabrera would still be subject to a 12-level increase even if we only attributed the lowest possible amount ($50,000) rather than $100,000 because that would still bring him to "[m]ore than $250,000" but less than $550,000 in loss. *Id.* § 2B1.1(b)(1)(G).

We turn now to the December 7, 2020, delivery. When it comes to jointly undertaken criminal activity, "[a] district court must make particularized findings with respect to both the scope of the defendant's agreement to engage in jointly undertaken criminal activity *and* the foreseeability of his co-conspirators' conduct before holding the defendant accountable for that conduct." *Donadeo*, 910 F.3d at 899 (citation modified). And, of course, fundamentally there must be evidence to support the $80,000 attributed to Appellants. We now review the December 7, 2020, delivery by Nemetz to Pacheco's brother under this standard.

a

In *Donadeo*, we held that the particularized-findings requirement for the scope of jointly undertaken criminal activity had been satisfied as to quantity of drugs purchased where "witnesses

16

testified that the total amount of [drugs] purchased by [a defendant] and his coconspirators . . . was somewhere between 50 kilograms and 60 kilograms," and also in general where jointly undertaken criminal activity was suggested through "documents . . . in evidence . . . and . . . the testimony of [a law-enforcement] [a]gent." *Id.* at 899–900 (first quoting *United States v. Valentine*, 553 F. App'x 591, 597 (6th Cir. 2014); and then quoting *United States v. Labib*, 38 F. App'x 257, 261 (6th Cir. 2002)).

The district court made particularized findings that the scope of Appellants' jointly undertaken criminal activity covered Nemetz's delivery to Pacheco's brother. The procedure of Nemetz's delivery to Pacheco's brother exactly tracked the procedure of Nemetz's deliveries to Appellants: same hotel, same flight pattern, and even same address and reason for visit provided to the hotel at check-in. All these findings were made clear at trial through sources blessed in *Donadeo*: witness testimony, documents in evidence (such as flight records), and testimony from law-enforcement agents.

b

In *Donadeo*, we next held that the particularized-findings requirement for the foreseeability of a co-conspirator's conduct was satisfied if there was a finding "that the defendant was aware that the conspiracy was broader than merely the three transactions with which he was involved." *Id.* at 900. This low bar is easily cleared here. The court made particularized findings that the December 7 delivery was foreseeable to the Appellants. Appellants were far from being one-off criminals. Law-enforcement testimony at trial emphasized that Appellants' flight records indicated a pattern of "[p]icking up bulk cash." And Appellants' "regular, multiple trips" across many different states exhibited their high "level[s] of trust with [the criminal] organization as . . . courier[s]." Pacheco and Cabrera knew that this broad conspiracy could cover other money

17

laundering in Lexington, especially deliveries involving Pacheco's brother, who followed Appellants' exact modus operandi.

c

We are left with Appellants' argument that there was no direct testimony that Nemetz delivered $80,000 to Pacheco's brother on December 7. But while such a sum wasn't seized by law enforcement, the district court had sufficient evidence supporting the sum's existence. On that day, a DEA agent (undercover as a courier) had arranged to deliver $180,000 for a member of the underlying drug-trafficking conspiracy. The agent, trying to establish credibility, said that he could only handle $100,000. Nemetz delivered "just shy of" $100,000 to the undercover DEA agent that day, and then was followed by other DEA agents to the Marriott TownePlace Suites where Pacheco's brother was. Nemetz was holding a red Nike shoebox — trial testimony showed that it was common for law-enforcement agents to find drug proceeds concealed in shoe boxes for transfer and storage — and delivered the shoebox to Room 206, which Pacheco's brother had rented. And then Nemetz left the hotel without the shoebox.

All things considered, we do not have a "definite and firm conviction that a mistake has been committed" regarding the facts. *Id.* at 893. The district court made sufficient factual findings in attributing the respective amounts of loss to Appellants.

B

We reject Appellants' argument that the district court incorrectly applied a four-level Guidelines enhancement for their being "in the business of" money laundering. Appellants do not challenge the district court's factual findings. They argue instead purely on the law that their misdeeds do not rise to the level of being "professional" money launderers. But this argument

18

mistakenly manufactures an artificially higher bar, and we therefore hold that this enhancement was appropriate.

A four-level Guidelines enhancement is warranted if USSG § 2S1.1(a)(2) applies and the defendant was "in the business of laundering funds." USSG § 2S1.1(b)(2)(C). The former is uncontested here. And the latter is assessed by "consider[ing] the totality of the circumstances." *Id.* § 2S1.1 cmt. 4(A). We consider six "non-exhaustive . . . factors that may indicate the defendant was in the business for laundering funds" — whether the defendant: (1) "regularly engaged in laundering funds," (2) "engaged in laundering funds during an extended period of time," (3) "engaged in laundering funds from multiple sources," (4) "generated a substantial amount of revenue in return for laundering funds," (5) "had one or more prior convictions for an offense under 18 U.S.C. § 1956 or § 1957, or under 31 U.S.C. § 5313, § 5314, § 5316, § 5324 or § 5326, or any similar offense under state law, or an attempt or conspiracy to commit any such federal or state offense" at the time that the defendant committed the instant offense, and/or (6) "[d]uring the course of an undercover government investigation, . . . made statements that the defendant engaged in any of the conduct described in [(1) through (4) above]." *Id.* § 2S1.1 cmt. 4(B).

Appellants thus incorrectly argue that they can only be subjected to this enhancement if their activities "were similar to those of a professional 'fence' that routinely engaged in the laundering of monies and gained therefrom substantial financial gain." They have improperly collapsed together two separate factors — routine or regular engagement (Factor 1 above) and generation of substantial revenue (Factor 3 above) — to erect a higher bar to the enhancement.

Viewing instead the factors as separate contributors to the totality of the money-laundering circumstances, the four-level Guidelines enhancement was warranted. Evidence from undercover agents shows that Appellants "regularly engaged in laundering funds" during the "extended period

of time" of at least December 7, 2020, to October 28, 2021. *Id.* § 2S1.1 cmt. 4(B)(i)–(ii). Appellants also "engaged in laundering funds from multiple sources" — the brokers in Mexico who arranged money pickups for the Lara-Garcia drug-trafficking organization were not the same brokers who arranged for money pickups by Pacheco in New Jersey and Los Angeles. *Id.* § 2S1.1 cmt. 4(B)(iii). And at multiple times Cabrera "made statements that [he] engaged in" money laundering to DEA agents who were in "the course of an undercover government investigation." *Id.* § 2S1.1 cmt. 4(B)(vi). Given that these factors are "non-exhaustive," the biggest overarching consideration is that Appellants had their system so regularized. They purchased one-way flight tickets the day of or just one day before their travel. They would fly into particular airports, then fly out from different airports by adding intermediary legs of travel. And Appellants would habitually stay at a hotel near an airport — rarely for longer than a night — while waiting for their next laundering contract. All the facts show that Appellants were "in the business of laundering funds." *Id.* § 2S1.1 cmt. 4(B).

C

Finally, we reject Cabrera's argument that the district court should have applied a two-level Guidelines reduction in his offense level because he was a minor participant. Cabrera included this argument in his statement of the issues but did not discuss it further in his brief. But "an issue is deemed forfeited on appeal if it is merely mentioned and not developed." *United States v. Clark*, 469 F.3d 568, 570 (6th Cir. 2006).

\*     \*     \*

For the foregoing reasons, we **AFFIRM** on all grounds.